**LEUCADIA, INC., Plaintiff–Appellant,**

v.

**RELIANCE INSURANCE COMPANY, Defendant–Third–Party Plaintiff–Appellee,**

v.

**Edward H. HELMKE, Third–Party Defendant.**

**No. 1333, Docket 88–7197.**

United States Court of Appeals, Second Circuit.

Argued June 3, 1988.

Decided Dec. 22, 1988.

As Amended on Denial of Rehearing Jan. 18, 1989.

---

Raymond Fitzgerald, New York City (Butler, Fitzgerald & Potter, New York City, Andrew W. Sidman, David J. McCarthy, of counsel), for plaintiff-appellant.

Philip Schlau, New York City (Newman Schlau Fitch & Burns, P.C., New York City, Abraham S. Altheim, Jan Kevin Myers, of counsel), for defendant-third-party plaintiff-appellee.

Perry S. Reich, Lindenhurst, N.Y. (Schapiro and Reich, Lindenhurst, N.Y., Steven M. Schapiro, of counsel), for third-party defendant.

Before LUMBARD, MINER, Circuit Judges, and CONNER, District Judge.*

LUMBARD, Circuit Judge:

Leucadia, Inc. appeals from a judgment of the Southern District entered on February 5, 1988, Daronco, *J.*, pursuant to a jury verdict in favor of Reliance Insurance Company and third-party defendant Edward H. Helmke. Leucadia, which is in the business of factoring and investing, brought this action to recover $10 million pursuant to two fidelity bonds issued to it by Reliance, because of losses totaling over $15 million, allegedly sustained as a result of the dishonest and fraudulent acts of its employee Helmke while he was head of Leucadia's mortgage loan department. Reliance impleaded Helmke as third-party defendant for indemnification. Jurisdiction is based on diversity of citizenship, as Leucadia is a New York corporation, and Reliance is a Pennsylvania company. The parties agree that New York law applies.

Leucadia makes two principal claims. First, it asserts that the district court erroneously instructed the jury that Reliance was liable only for those fraudulent and dishonest acts committed during the period the bonds were in force, namely from May 1, 1976 to October 25, 1977. Leucadia alleges that the second bond covered all losses sustained while the bond was effective, regardless of when the acts that caused the losses had been committed. Leucadia also asserts that it was error for the judge to rule that any evidence of alleged misconduct occurring prior to the effective date of the first bond could be considered by the jury only to show intent to commit similar acts within the coverage period.

Second, Leucadia claims that the district court erred in instructing the jury that Leucadia was required to prove that Helmke had acted dishonestly by clear and convincing evidence. It alleges that, because the fidelity bonds covered both fraud and dishonesty, the court should have charged that there were different burdens of proof for fraud and dishonesty. Only a preponderance of the evidence is necessary to prove acts of dishonesty under New York law.

We hold that the district court correctly limited the coverage of the bonds to acts committed within their duration and that

---

* The Honorable William C. Conner, Senior United States District Judge for the Southern District of New York, sitting by designation.

therefore it was proper to admit evidence of prior alleged misconduct only for the purpose of showing Helmke's intent. On Leucadia's second claim, we find that, because the fidelity bonds insured against either a "dishonest or fraudulent act," under New York law the court should have instructed the jury to employ separate evidentiary standards for proving fraud and for proving dishonesty. Judge Daronco correctly charged the jury that, in order to find that Leucadia's losses had resulted from fraudulent acts, it must find that the evidence of fraud was clear and convincing. However, he should also have instructed the jury that, in deciding whether any of Leucadia's losses had resulted from Helmke's dishonest acts, they would only have had to find that this was established by a preponderance of the evidence.

Although it was error for the court to charge the jury that there was a higher standard for dishonesty, our review of the evidence convinces us that no reasonable jury could have found that Leucadia had failed to establish Helmke's dishonesty by a preponderance of the evidence. In view of the evidence, the court's error was therefore harmless.

In May 1976, Leucadia purchased a fidelity bond (the May bond) under which Reliance agreed to indemnify it for up to $2 million in losses resulting from dishonest or fraudulent acts of an employee committed from May 1, 1976 through the bond period. On December 1, 1976, Leucadia cancelled the May bond and replaced it with a second fidelity bond (the December bond) to cover similar losses, this time up to $5 million, sustained from December 1, 1976 through its cancellation in October 26, 1977. The December bond provided continuing coverage for losses that would have been recoverable under the May bond but which were only sustained and discovered during the December bond's term.

Both fidelity bonds stipulated that for a loss to be covered, it must have been the "direct result" of a "dishonest or fraudulent act" of an employee or agent. As defined in a rider to both bonds, a "dishonest or fraudulent act" means:

only dishonest or fraudulent acts committed by [an] Employee with the manifest intent:

> (a) to cause the Insured to sustain [a] loss; and
>
> (b) to obtain financial benefit for the Employee or for any other person or organization intended by the Employee to receive such benefit....

In October 1978, Leucadia discovered that it had suffered losses allegedly within the coverage of the fidelity bonds. It believed that Helmke had fraudulently and dishonestly loaned millions of dollars of Leucadia's money to three borrowers, Isaac Silverman, Wayne Duddlesten and Morris Suson, and it demanded that Reliance pay it $10 million pursuant to the fidelity bonds. Reliance refused and Leucadia brought suit.

The evidence adduced at the four-week trial which concluded on January 29, 1988 showed the following. Helmke began his employment with James Talcott, Inc., Leucadia's predecessor in interest, on March 25, 1963 as assistant in-house counsel in the legal department. On March 1, 1965, he became an assistant secretary in the company's mortgage loan department where his duties were to process and supervise loans. In August 1967, he was promoted to assistant vice president of the mortgage loan department, in which he processed and supervised loans. On April 15, 1972, Helmke was promoted to vice president and manager of the mortgage loan department, where he remained until his termination on September 1, 1977.

As manager of the five-man mortgage loan department, which was engaged in making speculative investments involving real estate, investment trusts, and second and third mortgage loans, Helmke was responsible for overseeing all the accounts, for insuring that Leucadia received sufficient collateral on new loans and for protecting existing collateral on loans that were in default. In this position, Helmke reported directly to the president.

Prior to February 1, 1977, Helmke had the power to advance up to $350,000 in new investments. To effect a loan, someone in

the mortgage loan department (usually Helmke) had to fill out and initial an advance card reflecting the amount of the loan. The card was then forwarded to the cashier's department, from which the money was paid out. After February 1977, Helmke's authority was reduced to $1,000 and he was additionally required to obtain the approval of Leucadia's senior credit committee, which based its decisions largely on internal memos, quarterly status reports, monthly statements of delinquent accounts, and computer credit worthiness analyses that Helmke provided.

In mid-October 1977, two weeks after his termination on September 1, 1977, Helmke became director and president of a company controlled by Silverman's son-in-law, Marvin Shafron, who had assisted Silverman during the period when Helmke, as head of the department, had loaned Silverman money.

The facts concerning Helmke's dealings with the three borrowers, Silverman, Duddlesten and Suson, are as follows:

*The Silverman Transactions*

Isaac Silverman, a client of Leucadia's since the 1960s, used most of his borrowed funds to operate the Grand White Realty Corporation, a New York company he owned. Grand White owned seven properties in New York on which Leucadia had second and third mortgages as security for its loans. Silverman also gave Leucadia a personal guaranty on the loans. The Grand White loan, the subject of a "consolidation extension agreement" in 1970, was scheduled to be repaid in August 1973, one year into Helmke's tenure as head of the mortgage loan department. By then the debt was in default for over $6 million.

In the summer of 1973, Helmke entered into a second consolidation and extension agreement with Silverman which postponed repayment to January 1975. At about the same time, Helmke caused Leucadia to foreclose upon one of the seven properties securing the Grand White loans and reduced the outstanding debt accordingly.

Later in 1973, Helmke returned one of Silverman's personal guaranties. At trial he explained that this guaranty meant nothing to Leucadia because its policy was never to collect personal guaranties and, in any event, it had other Silverman guaranties on file; the return of this one guaranty, he said, was necessary in order to negotiate certain terms of a loan agreement with Silverman.

From 1972 to 1976, as a result of a decline in the real estate market, the properties that collateralized the Grand White loan became less marketable. In a status report to his superiors in 1976, Helmke stated that the net appraised total value of the collateral was $10,984,828 (arrived at after deducting the amount of the prior mortgages to cover the Leucadia mortgage), in contrast to its 1972 appraised value of $21,200,000.

Leucadia claims that in this report Helmke overrepresented the value of one of the properties by $1,350,000 to $2,000,-000. Helmke cited its appraised value at $7,780,000 when it had only been appraised from $5,800,000 to $6,500,000. Helmke testified that he had not prepared the figures for this property, which had been reappraised several times, and that he had believed them to be an accurate measure of "intrinsic", even if not "appraised", value. He said that he believed intrinsic value was a more useful criterion by which to determine how much money to advance, because the market was artificially low at that point.

In the summer of 1973, Leucadia convinced Silverman to settle a lawsuit involving rent and overtime claims against IBM, the sole tenant of a group of office buildings in White Plains, New York, one of the properties securing the Grand White loans. Silverman had assigned the rent received from IBM to Leucadia, which therefore had an interest in retaining IBM as a tenant. Silverman agreed to drop his lawsuit and settle with IBM; Leucadia received $1,641,-008 of the proceeds, which totaled $1,951,-008, and Silverman got the remaining $310,000 of the proceeds in addition to two new advances, one of $80,000 (the "Sealist loan" in Manhattan) and one of $40,000 (the "Madimore loan" in Florida).

At the time of this White Plains arrangement, Helmke did not fully inform the senior credit committee about the $310,000 Silverman was to realize in the deal. He did not run the check for $310,000 through Leucadia's books. Helmke testified that his instructions were to obtain a settlement and, given the pressure of the situation, he believed that $310,000 was a small price to pay to induce a settlement which was highly beneficial to Leucadia.

The two loans Helmke made to Silverman were collateralized and approved by his superiors. For the Madimore loan Helmke secured an assignment of a contract. He secured the Sealist loan by a personal guaranty and an unrecorded mortgage. In May 1976, although the Sealist loan had been in default since January 1975, Helmke advanced an additional $10,000 on the Sealist account. Helmke testified that he was trying to enhance the collateral and tide the property over until better times. The loan was eventually repaid in full after Helmke's termination in 1977.

Thomas Mara, a vice president at Leucadia since April 1977, testified that from May 1976 to September 1977, Helmke made loans totaling $4,340,170.05 to Silverman. Of this, $2 million was for the renovation of 315 Park Avenue South in Manhattan, one of Silverman's failing properties that collateralized the Grand White loans. The renovations were made in accordance with a lease entered into in September 1975 between Silverman and the Optometry School of the State University of New York.

Leucadia asserts that Helmke poured money into this renovation, despite Silverman's long-standing default on the loan. Approximately $4 million in principal was outstanding on the first mortgage on 315 Park Avenue South as of January 1, 1976; and the building's equity was already encumbered by a second mortgage and was part of Leucadia's security for its loan of approximately $10 million to Grand White. Although Silverman personally guaranteed this loan, Helmke did not obtain a promissory note or mortgage for these renovation loans. He testified that he was simply following the same procedure he used for all advances made on the Grand White account. Furthermore, company policy was geared to enhancing the value of collateral rather than to writing off loans.

Leucadia's claim that Helmke was responsible for overpaying the renovation company for poor work is not supported by the evidence.

*The Duddlesten Transactions*

With regard to the Duddlesten loans, Leucadia claims it sustained losses of $2,284,575.87 during the bond period as a result of Helmke's dishonest and fraudulent acts of advancing money to the Seamist Corporation, a company controlled by Duddlesten. Leucadia contends that Helmke, between 1974 to 1976 (prior to the bond period), improperly advanced money on a credit line he had established for Seamist. These loans were secured by collateral which included a third mortgage on certain Seamist properties and Duddlesten's personal guaranty. The complaint alleges that Helmke during the bond period (i) failed to obtain collateral which he represented to the senior credit committee that he would secure; and (ii) knowingly accepted a worthless deed in exchange for releasing Duddlesten from Duddlesten's personal guaranties on the Seamist loans, even though Seamist and Duddlesten together owed Leucadia over $2 million. Leucadia also claims that it sustained losses of $173,800 during the bond period as a result of Helmke's simultaneous retention of two managers, Edmund Boylan and Duddlesten himself, to manage Main 2016, a building in Houston, Texas.

In December 1974, Helmke advanced $1.2 million to Seamist, secured by Duddlesten's personal guaranty, his promissory note, and a deed of trust, under which title to 708 acres owned by Seamist in Fort Bend County, Texas was to be held in trust pending satisfaction of the loan. On February 4, 1975 an additional $365,000 was advanced by Helmke and similarly secured. All these loans were made with the knowledge and approval of Leucadia's senior credit committee. At one point, Helmke advised the committee that the Seamist

loan would be cross-collateralized. In fact, it never was collateralized. Helmke testified that he had tried unsuccessfully to obtain the cross-collateralization.

The Seamist loans were unpaid at the time of their maturity in January 1976. In the late summer of 1976, in order to settle this debt, Helmke agreed to release Duddlesten's personal guaranties in exchange for a deed to the 708 acres owned by Seamist on which Leucadia already had a third mortgage.

Helmke testified that Duddlesten's personal guaranty was worthless to Leucadia and that Duddlesten had made several claims against Leucadia at the time, including a usury claim and the right to file a lien on Main 2016, which Leucadia wanted to sell. As already stated, although the firm often took personal guaranties from borrowers, it never attempted to collect on personal guaranties.

Helmke testified that, in light of the difficulties Leucadia had experienced concerning Texas usury law, it was prudent to return Duddlesten's personal guaranty, in trying to negotiate a settlement and thus avoid the loss of all the loans to Seamist. Helmke said that the 708 acres were originally worth several million dollars but that poor real estate market conditions in Texas during the late 1970s made it difficult for Leucadia to recoup its losses by selling the land. Other Leucadia executives also attested to the depressed Texas market at that time. In any event, in January 1978 the second mortgagee foreclosed its mortgage on 635 acres of the 708.8 acres of property, leaving Leucadia with 73.8 acres still subject to the first mortgage. Finally, in July of 1978, Leucadia sold its interest in the 73.8 acres, subject to the first mortgage, to the second mortgagee for $102,456.86.

Leucadia obtained title to Main 2016, a building originally owned by Duddlesten's Seamist Corporation, by foreclosing its second mortgage on the property on April 4, 1972. In January 1973, Helmke hired Duddlesten to manage Main 2016 and also granted him an option to purchase it. In 1976–77, Duddlesten threatened to exercise his option and file a lien on Main 2016. This would have clouded Leucadia's title and prevented it from selling the land, as it was eager to do. However, as a result of Helmke's deal with Duddlesten, Duddlesten did not file a lien. Leucadia later sold the property.

From January 1973 to May 1976, Leucadia was paying both Duddlesten and Edmund Boylan to manage Main 2016. Boylan had originally been employed by Leucadia in August 1972 and Duddlesten was hired to help him in January 1973. At the time, Thomas Mara considered Boylan incompetent and inexperienced. Helmke testified that Boylan needed experienced help from somebody like Duddlesten. In any event, Leucadia's management knew about the overlap; Mara eventually fired Boylan in late 1977.

*The Suson Transactions*

With respect to the Suson loans, Leucadia alleges it sustained losses of $2,485,555.35 during the bond period as a result of Helmke's dishonest and fraudulent advances to Suson and his interests. Leucadia claims that Helmke made loans (1) without authority; (2) without any collateral to secure their repayment; (3) knowing that Suson had committed certain improprieties which had adversely affected the collateral securing the loans; and (4) continued to make advances even though Suson and the entities he controlled were substantially in arrears.

Helmke first became involved in the Suson accounts in April 1972, when Leucadia advanced a total of $3,600,000 over several months to Suson to be repaid in April 1974. These loans were secured by second and third mortgages on properties among which were the Kingston Apartments and the Dempster Plaza Shopping Center, both located near Chicago.

Between April 1974 and 1975, Helmke advanced an additional sum of about $1,565,000 to Suson's trusts. Helmke represented to the senior credit committee that the collateral for the loan would be a blanket third mortgage on certain properties and a "secondary position" on another

shopping center then under construction in the Chicago area.

Helmke secured all the collateral he said he would obtain, with the exception of the secondary position on the shopping center, for which he instead obtained an assignment of Suson's beneficial interest in the trusts which covered this property.

Of this $1,565,000 loan, $279,075 was used to pay interest arrearages and build a credit balance from which future interest payments would be made on certain of Suson's other loans with Leucadia. A further $231,550.24 was used to pay interest arrearages on the $3,600,000 loan. Thomas Mara testified that it was an accepted practice at Leucadia to use money for this purpose. The rest of the loan was used to expedite the completion of the shopping center and the renovation of the Kingston apartment units under construction. These uses had the full approval of the senior credit committee.

From October 13, 1976 to May 25, 1977, Helmke loaned Suson an additional $3,554,050. Of this amount, $900,000 provided Suson with the funds to purchase, at a discount, an office building and the shopping center under construction. $300,000 of this $3,554,050 was advanced to pay for a prior commitment and was secured by a mortgage. Although Leucadia claims there was no collateral for the $900,000, Helmke testified that he secured a promissory note in the amount of $600,000, an assignment of a beneficial interest, and an assignment of option rights.

By October 13, 1976, Suson was about $1,700,000 in default on interest payments to Leucadia. Helmke nevertheless loaned him an additional $2,654,050 to renovate the Kingston Apartments without obtaining an additional mortgage. Helmke testified that he had an agreement with Suson that they would also be covered by Leucadia's existing mortgage on the Kingston Apartments. Both Franklin Johnson, a member of the senior credit committee, and John Kingston, Leucadia's president, knew of these advances. Moreover, in 1977, Kingston instituted a special credit review committee to receive detailed reports on bad accounts, of which Suson was one.

In late 1976, Helmke suspected that Suson may have forged his signature on certain documents pertaining to Leucadia's collateral on Suson properties. He contacted Elihu Fier, a lawyer whom Leucadia had retained on various matters, and asked him to investigate the question of Suson's forgery.

In mid–1977 it was discovered that Suson had in fact forged releases of Leucadia's security instruments in various properties, including the Kingston Apartments. Thomas Mara testified that after Helmke's termination, Leucadia asserted claims against Chicago Title, the company that had insured Leucadia and another lender, also a creditor of Suson, who had made additional loans to Suson in reliance on the forged release of Leucadia's security interests. The other lender also asserted claims against Chicago Title and a lawsuit ensued. A settlement was eventually reached whereby Chicago Title paid $8,150,000 to Leucadia and released the second mortgage on the Dempster Plaza Shopping Center, on which Leucadia thereafter recovered $1,000,000 after foreclosure.

*The Jury Charge*

Judge Daronco instructed the jury that Reliance was liable only for those of Helmke's acts of alleged fraud or dishonesty that occurred during the bond period, that is, from May 1, 1976 until October 25, 1977. He also charged that the evidence of alleged misconduct occurring prior to the commencement of the bond period was admitted for the limited purpose of showing Helmke's intent to commit similar acts during the coverage period.

The judge further instructed the jury that Leucadia bore "the burden of proving by clear and convincing evidence that an act committed by Edward Helmke was dishonest or fraudulent." He stated that this standard is "more exacting" than proof by a preponderance of the evidence in that the former should leave "no substantial doubt" in the jury's mind, while the latter required only that Leucadia's claim is more likely true than not true. Leucadia, having re-

quested that the jury be charged with the lower standard, took exception to this charge.

Judge Daronco supplied the jury with typewritten copies of his charge and prepared a verdict form containing three special interrogatories. The jury's verdict was for Reliance on the claim between Reliance and Leucadia and, therefore, necessarily in favor of Helmke on the claim between Reliance and Helmke. The jury answered only one of the special interrogatories, responding that Helmke did not commit any "dishonest or fraudulent acts with the manifest intent to cause Talcott to sustain a loss and to obtain financial benefit for himself or for any other person or organization intended by him to receive such benefit" during the period of coverage of the bonds. Thus the jury never reached the two remaining special interrogatories regarding the computation of damages.

*The Period of Liability*

 Leucadia claims that while the May bond specifically insured against losses resulting solely from "acts committed" during the bond period, the language of the December bond provided indemnification for "losses sustained" during the bond period—without specifying when those acts must have been committed. Leucadia alleges that from this omission in the December bond it should be inferred that the acts could have been committed at any time so long as the losses were sustained during the bond period. Judge Daronco ruled that, although the wording of the bonds differed, Reliance's intention was the same, namely, to insure for acts occurring only during the bond period (May 1, 1976 to October 25, 1977). Any other reading would require a fidelity bond company to assume responsibility for acts committed prior to the coverage period of which it could have had no knowledge.

Consequently, the court ruled that any evidence of Helmke's dishonesty regarding particular borrowers prior to the bond period would be admitted only to show "fraudulent intent on the part of Helmke" to commit similar dishonest acts within the bond period (*i.e.*, to show lack of mistake).

We find no error in the district court's ruling that Reliance was liable only for those fraudulent and dishonest acts committed during the period the bonds were in force, May 1, 1976 to October 25, 1977. As Judge Daronco noted, allowing an insured to recover for acts committed before the period of insurance began, when the loss did not occur until the covered period, would strain the language of the bond instrument. It would make the insurance company responsible for acts which occurred before the loss was realized and of which it could have no knowledge.

It is well established that, "[i]n the absence of a clearly expressed contrary intent, fidelity guaranty contracts have prospective operation only, and they do not cover defaults occurring prior to the date when such contracts became effective," 13 Couch on Insurance 2d, § 46:176 at 137 (Rev. ed. 1982) (footnotes omitted). Thus, the December bond, with its absence of language specifying the time frame during which acts must have been committed, is presumed to have prospective operation only. *Van Schaick v. American Surety Co.*, 252 App.Div. 489, 299 N.Y.S. 908 (1st Dep't 1937), *motion for leave to appeal denied*, 277 N.Y. 740 (1938).

*The Standard of Proof*

The third allegedly erroneous ruling occurred when Judge Daronco, not distinguishing between the terms dishonesty and fraud in the bonds, instructed the jury that Leucadia had to prove that Helmke's acts were dishonest or fraudulent by "clear and convincing evidence."

 We find that the court's instructions were not in accord with New York law. The fidelity bonds issued by Reliance cover losses resulting from either "dishonest or fraudulent" acts. Under New York law, the standard of proof required to prove a fraudulent act differs from that required to prove a dishonest act. Fraud must be proven under the higher "clear and convincing" evidence standard. *Hutt v. Lumbermens Mutual Casualty Company*, 95 A.D.2d 255, 466 N.Y.S.2d 28 (2d Dep't 1983). Dishonesty, however, need be

proven merely by a "preponderance of the evidence." *Sutro Bros. & Co. v. Indemnity Ins. Co. of North America*, 264 F.Supp. 273, 282 (S.D.N.Y.), *aff'd*, 386 F.2d 798 (2d Cir.1967) (in the case of a blanket bond indemnifying brokers against any loss of property through common law or statutory larceny, a preponderance of the evidence is the appropriate standard by which to prove dishonest acts such as common law or statutory larceny, theft, or misrepresentation). *See also Aetna Cas. & Sur. Co. v. Glass*, 75 A.D.2d 786, 428 N.Y.S.2d 246, 247 (1st Dep't 1980) (a preponderance of the evidence is the appropriate standard by which to prove conversion), *and* Appleman, *Insurance Law & Practice*, Vol. 21B, § 12774 at 311–312 (Rev. ed. 1980).

Reliance maintains that the two terms should be construed as synonymous, first, because fraud and dishonesty are always referred to in conjunction with each other; and second, because any other interpretation would mean that an insured would never attempt to prove fraud, since it would be easier to prove dishonesty. They claim that an interpretation attaching different evidentiary standards to the two words would essentially read "fraudulent" out of the contract because it would be included within the meaning of "dishonesty."

New York law does not, however, consider the words fraud and dishonesty to be synonymous. Dishonesty is broader and may cover acts which fall short of constituting fraud. The evidentiary standards for acts that involve moral turpitude but not fraud is the preponderance of the evidence. *Aetna Cas. & Sur. Co. v. Glass*, *supra*. Even where the acts are intentional offenses, "all that is required is that there be satisfaction of the usual civil rule of proof by a preponderance of the evidence," 13 Couch on Insurance 2d, § 46:86 at 80 (Rev. ed. 1982).

 When two or more causes of loss are disjunctively stated in the context of a fidelity bond, it is sufficient that the loss be caused by any one of them. *Fidelity & Casualty Co. v. Blount Plow Works*, 78 Ind.App. 529, 136 N.E. 559 (1922). Thus "a

bond indemnifying against loss through fraud, dishonesty, forgery, theft, embezzlement, or wrongful abstraction, is not confined exclusively to loss from dishonest acts." 13 Couch on Insurance 2d, § 46:44 at 49, citing *Fidelity & Casualty Co., supra*. It follows that for each cause of loss stated in a fidelity bond, a separate burden of proof attaches. The court thus should have accorded the preponderance burden to the term dishonesty and distinguished it from the higher burden applicable to fraud.

 We find, however, that, in view of the evidence at trial, the error in the court's charge was harmless. As Reliance argues, the record fails to show that Helmke committed any acts of dishonesty with the "manifest intent" either "to cause the insured to sustain [a] loss" and "to obtain financial benefit" for himself or for others even under the preponderance of the evidence standard. We find that Reliance has met its burden of showing that the error made no difference.

In the 1970s, prior to Helmke's becoming head of the mortgage loan department, the real estate market was depressed, and many of Leucadia's loans were in default. In several cases the amount of the loans outstanding exceeded the value of the real estate securing them. Leucadia was repeatedly in upheaval, undergoing four major changes of management in less than fifteen years. Leucadia's losses were therefore due in part to the depressed market conditions, in part to Leucadia's internal disorganization, and in part to the mismanagement of its accounts and its failure properly to supervise its employees.

Furthermore, there is no evidence Helmke intended to benefit himself or others by continuing to advance money to borrowers in arrears.

Almost all of Helmke's decisions to advance moneys which ultimately resulted in losses can be construed to be reasonable under all the circumstances. Almost all were subject to the approval of other Leucadia officials and most of them were expressly approved.

Leucadia had a credit agreement with a consortium of about 125 banks whereby the banks would lend Leucadia money so long as the company's net worth remained above a certain level. A foreclosure of mortgages on realty would have adversely affected Leucadia's net worth. In this context the loans Helmke made may plausibly be viewed as an attempt to keep properties afloat and to preserve the existing collateral in order to prevent difficulties for Leucadia under the credit agreement.

Franklin Johnson, a member of Leucadia's board of directors and a consultant to the firm since early 1976, testified that, in view of the depressed real estate market in the 1970s, renovation of properties was critical in order to save Leucadia from breaching its credit agreement with the banks. Foreclosures would reduce Leucadia's ability to maintain its credit. Thomas Mara testified that it was not contrary to company policy to enhance the value of collateral held by the company in troubled accounts. Indeed, there was evidence that the practice continued even after Helmke's tenure.

The most questionable of Helmke's actions vis-a-vis Silverman was his knowing misrepresentation to his superiors that the amount of collateral available for the Grand White loan on Silverman's account was $1.3 to $2 million more than it was. This misrepresentation falls short of meeting the test of dishonesty in the fidelity bonds since there was no manifest intent to benefit Silverman at Leucadia's expense. At worst, Helmke misled his superiors in order to get approval for a loan he thought necessary to save the property.

Leucadia's other allegations of Helmke's misconduct concerning Silverman—such as writing the latter a check to induce him to settle the IBM case without notifying his superiors—are less egregious and, although they may be violative of company policy, can reasonably be explained as attempts to save properties in default.

William Healey, Helmke's predecessor as head of the mortgage loan department, testified that the Silverman properties had to be kept afloat to await better times, which Helmke and others felt were coming. This faith in the ultimate value of the properties was vindicated. The real estate market began to improve in 1978, and after Silverman went into bankruptcy on December 23, 1977, Leucadia foreclosed and sold all of his properties in its portfolio. Between 1978 and 1982, Leucadia recovered almost $46 million as a result of these sales and thus suffered no net loss on Silverman's account.

Nor does the record show any dishonest acts by Helmke concerning the Duddlesten loans. There is no evidence that the money was improperly advanced prior to the bond period; for these advances Helmke had the approval of Leucadia's senior credit committee. His representation to the senior credit committee that the Seamist loan would be cross-collateralized, when, in fact, it was not, appeared to be an expectation which was not realized, made without any intent to deceive or defraud Leucadia.

As to the deal Helmke struck with Duddlesten during the bond period, in which he returned the latter's personal guaranties in exchange for a deed on 708 acres, this appears to have been part of an arrangement whereby Helmke was trying to avoid any claim of usury. Leucadia had experienced difficulties with Texas usury law in the past and stood to lose its claim to the properties which collateralized the Duddlesten loans as well as its principal and interest. It therefore seemed reasonable to give up personal guaranties which, according to Thomas Mara, Leucadia never had any intention of enforcing.

Furthermore, Duddlesten had threatened to file a lien to substantiate his option to purchase Main 2016, one of the properties Leucadia had been trying to sell. Helmke's settlement was a means of avoiding this outcome and was a reasonable way of promoting Leucadia's interests. Helmke was negotiating in a situation where Leucadia had little leverage and much to lose; but there is no evidence of dishonesty.

With respect to the Suson loans, Helmke cannot reasonably be blamed for Leucadia's loss. This loss was due to forgeries perpetrated by Suson. The forgery put Leucadia in a position of having to take less money and having to reach a settle-

ment with the company insuring the loans in order to avoid incurring a greater loss. Nor is there any evidence that Helmke knew about Suson's forgery or connived with him to conceal it at Leucadia's expense. Rather, he initiated the investigations that eventually uncovered the suspected fraud. In fact, these investigations ultimately resulted in settlement proceedings from which Leucadia received $9,150,-000 after Helmke's termination.

The fact that Helmke became a director at one of the companies Silverman controlled six weeks after he was terminated in September 1977 does not show that his advances to Silverman since 1975 had been made with an intent to benefit himself at Leucadia's expense. It is common for business relationships to develop in such a way that they result in the employment of one party by the other.

In sum, we are convinced beyond a reasonable doubt that no reasonable jury could have found that there was a preponderance of the evidence to show that, during the bond period, Helmke had committed any dishonest acts which caused a loss to Leucadia.

AFFIRMED.