

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-4-2000

# Resolution Trust Corp. v. Fidelity & Deposit Co. of MD,et al. (Part I)

Precedential or Non-Precedential:

Docket 98-6368

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Resolution Trust Corp. v. Fidelity & Deposit Co. of MD,et al. (Part I)" (2000). *2000 Decisions.* Paper 18.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/18

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 4, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-6368

RESOLUTION TRUST CORPORATION,
as Receiver for City Savings, F.S.B., in Receivership,

v.

FIDELITY AND DEPOSIT COMPANY OF MARYLAND;
WILLEM RIDDER; JOHN T. HURST; LYNDON C. MERKLE;
GREGORY DEVANY

Federal Deposit Insurance Corporation, as statutory
successor to Resolution Trust Corporation,

        Appellant

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 92-01003)
District Judge: Honorable William H. Walls

Argued December 15, 1999

BEFORE: MANSMANN, GREENBERG, and MCKEE,
Circuit Judges

(Filed: February 4, 2000)

        Anthony J. Sylvester
        Craig L. Steinfeld
        Riker, Danzig, Scherer, Hyland
         & Perretti
        One Speedwell Avenue
        Morristown, NJ 07962

        Barbara Sarshik
        Ann S. DuRoss
        Assistant General Counsel
        Colleen J. Boles
        Senior Counsel
        Daniel Glenn Lonergan (argued)
        Counsel
        Federal Deposit Insurance

Corporation
550 17th Street, N.W.
Washington, DC 20429

 Attorneys for Appellant

Gregory R. Haworth (argued)
Lauren Debruicker
Duane, Morris & Heckscher LLP
One Riverfront Plaza
Newark, NJ 07102

 Attorneys for Appellee

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

This appeal arises from a dispute concerning coverage under a savings and loan blanket fidelity bond the appellee, Fidelity and Deposit Company of Maryland ("F&D"), issued to City Federal Savings Bank ("City Federal"), in 1987. In particular, the Federal Deposit Insurance Corporation ("FDIC"), as statutory successor to the Resolution Trust Company ("RTC"), appeals the district court's order of summary judgment entered against it on January 29, 1998,

2

on its action on the bond.1 It contends that the district court erred in holding that no reasonable jury could conclude, based on the evidence presented, that City Federal "discovered" a covered loss within the bond period as required by the bond's terms for there to be coverage. In response, F&D asserts that the district court's ruling on the discovery issue is correct, and that alternatively, it is entitled to summary judgment because the loss City Federal sustained is not covered by the bond. For the reasons that follow, we will reverse the district court's order of summary judgment, and remand the matter to the district court for further proceedings consistent with this opinion.

II. FACTS and PROCEEDINGS

A. Background

We draw the relevant facts from the district court's opinion and the parties' submissions in the summary judgment proceedings before the district court. 2 See

1. The RTC originally filed the complaint in the district court, but the FDIC, as the RTC's statutory successor, has taken this appeal. See 12 U.S.C. S 1441a(m). As a matter of convenience we refer to the appellant as the RTC.

2. In this appeal, the parties rely specifically on the "12G Statement of Undisputed Facts" the RTC submitted in opposition to F&D's motion for summary judgment, see app. at 125-175, as well as the "12G Statement of Undisputed Facts" the RTC submitted in opposition to individual defendant Lyndon Merkle's motion for summary judgment. See SA at 39-105. Those statements, in turn, set forth the historical facts giving rise to this dispute. Because neither party has contested the accuracy of the historical facts set forth in the 12G statements, and in view of the circumstance that all of the relevant deposition testimony is not in the record before this court, we have relied on those factual statements and other portions of the record in deciding this appeal. However, to the extent that the parties' briefs indicate that there are disputed facts, we will refer to the RTC's version because we must view the facts in the light

most favorable to it, the non-movant before the district court.

We also note that the parties submitted separate appendices in this appeal. We refer to the RTC's appendix as "App. at ___," and F&D's appendix as "SA at ___."

3

Resolution Trust Co. v. Fidelity & Deposit Co., No. 92-1003, slip op. (D.N.J. Jan. 27, 1998) (hereinafter "Op. at ___"). Because this appeal is intensely fact-driven, it is necessary to set forth the factual background in some detail.

On March 22, 1987, F&D issued a "Savings and Loan Blanket Bond" ("the bond"), Standard Form No. 22, naming as insureds City Federal and its wholly-owned subsidiary City Collateral and Financial Services, Inc. ("City Collateral"). City Collateral was City Federal's mortgage warehouse lending operation.3 Among other things, the bond provided fidelity insurance, and stated that F&D would indemnify City Federal or its subsidiaries up to $5 million against losses it might suffer because of certain dishonest or fraudulent acts by its employees. The bond expired on March 22, 1989.

During the effective period of the bond, Willem Ridder ("Ridder"), John Hurst ("Hurst"), Lyndon Merkle ("Merkle") and Gregory DeVany ("DeVany") were City Federal and City Collateral employees, serving City Collateral in the following capacities: (1) Ridder was the president of City Collateral and Hurst's supervisor; (2) Hurst was a vice president of City Collateral, the director of financial services and

DeVany's supervisor; (3) Merkle was a senior financial services officer and also a vice president of City Collateral; and (4) DeVany was a financial services officer and an assistant vice president of City Collateral. Unless we otherwise note, we will refer to these persons collectively as the "individual defendants."

In June 1987, Kevin Corcoran ("Corcoran"), a City Collateral loan officer, presented City Federal's Executive

_____

3. The district court described the nature of a mortgage warehouse lending operation:

> First, a mortgage warehouse lender such as City Collateral advances money to a mortgage banker to fund mortgages on real property. In return, the lender is given the mortgage notes as security for the loan. Then, the mortgage banker sells the mortgage notes to the Federal Home Loan Mortgage Corporation or some other investor and tells the lender to forward the mortgage notes to that investor.

> The lender sends the notes to the investor, and then the mortgage banker uses the proceeds of the sale to repay the lender.

4

Committee ("Executive Committee") and Officer's Loan Committee ("Loan Committee") with a proposal for a lending arrangement whereby City Collateral would extend a $30 million warehouse credit line to Northwest Mortgage Company ("Northwest"). Northwest, a New Jersey company, originated residential mortgage loans and sold them to investors individually or in pools. At all times relevant to this case, Harry Movroydis ("Movroydis") was the president of Northwest. On June 16, 1987, City Federal and Northwest executed a "Master Mortgage Loan Warehousing Agreement" (the "master agreement") and related documents setting forth the terms and conditions of the lending arrangement.

In March 1988, Corcoran left employment at City Collateral, but before his departure, he told Hurst about certain problems he had experienced with the Northwest credit line. On or about April 1, 1988, Hurst and DeVany took over administration of the Northwest credit line. From approximately April 1, 1988, to November 1988, Merkle generated "exception reports" pertaining to the Northwest credit line and delivered those reports to both Hurst and DeVany. These reports provided the following information: (1) total amount of collateral that had been shipped to third-party investors for purchase but for which City Federal remained unpaid for at least 30 days (referring to

these loans as "shipped loans"), and (2) total amount of collateral that had not been shipped to third-party investors for purchase and for which City Federal had not been repaid by Northwest for at least 180 days from City Collateral's funding of the loan (referring to these loans as "warehoused loans"). Despite the fact that the exception reports for the Northwest credit line indicated numerous problems with the Northwest collateral, Hurst and DeVany did not distribute the reports to City Federal officials during the relevant time period.

In May 1988, Hurst wrote to Movroydis to inform him that Northwest was in violation of the master agreement. About the same time, DeVany and another City Collateral employee found difficulties with Northwest's list of commitments from third parties to buy notes and mortgages. DeVany did not report the problems to City

Federal's Real Estate Finance Committee. Despite these problems, Hurst recommended that the Loan Committee extend the maturity date of the credit line from May 31, 1988, to June 30, 1988. Moreover, Hurst did not inform the Loan Committee that the Northwest credit line was in technical default as of that time.

In June 1988, Hurst wrote to Northwest about a "workout plan" for the credit line to cure the violations of the master agreement. In July 1988, City Collateral put the credit line on its internal "watch list," which meant that the Northwest account had been identified as a problem credit. The individual defendants did not inform City Federal of this fact. Moreover, between June and September 1988, City Collateral continued to extend credit to Northwest while it closely monitored the loan. As F&D points out in its brief, the evidence demonstrates that there were improvements with Northwest's credit line during the summer of 1988. Northwest was able to reduce its warehoused loans from $8,036,027 as of June 30, 1998, to zero as of September 30, 1988. The shipped loans dropped from $7,040,357 as of June 30, 1988, to $5,695,890 as of September 30, 1988.

In or about May 1988, and coincidentally around the same time period that the Northwest credit line's maturity date was extended for the first time, Ridder, Hurst and Merkle learned from James McTernan ("McTernan"), a City Federal officer, that City Federal planned to sell City Collateral. According to the RTC, upon learning of City Federal's intent to sell City Collateral, Hurst, Ridder and Merkle promptly initiated discussions with City Federal about their potential compensation if the sale were

consummated. Apparently, Ridder, Hurst and Merkle negotiated what the parties call "golden handcuff agreements" or "closing agreements" with City Collateral throughout the summer and into the fall of 1988. See SA at 48.

As part of the effort to sell City Collateral, Drexel Burnham Lambert, Inc. prepared an offering memorandum that described City Collateral's business and corporate structure as well as its loan credits. Ridder, Hurst and Merkle worked on the credit section of this document, in

particular providing information for the section of the offering memorandum entitled "Workouts and Litigation." Although the Northwest credit line was in a "workout" status as of that time, they did not include it in this section of the offering memorandum. City Federal distributed the offering memorandum during the summer of 1988 to potential purchasers.

In September 1988, DeVany (under Hurst's supervision) prepared a written recommendation to extend and renew the Northwest credit line to June 1989, and in late September 1988, DeVany presented it to City Federal's loan committees. The report, and DeVany's oral presentation, omitted negative facts relating to the Northwest credit line, including, inter alia, its "workout" status and Northwest's technical default under the master agreement. The report also underestimated Northwest's risk rating in view of the various problems with the account. Indeed, F&D admits in its brief that while there appears to be a factual dispute as to what DeVany said at the committee presentation, giving the RTC every reasonable inference, "the most that can be said is that the Employees concealed the Northwest default and the workout plan in progress in order to induce City Federal to extend the loan." Br. at 7. Moreover, the record indicates that in September 1988, Hurst represented to City Federal that the Northwest credit line would be included in any future City Collateral sale. Nevertheless, Hurst told City Collateral employees in August and October 1988, that the Northwest credit line would not be included in any City Collateral sale.

After the September 1988 presentation, City Federal's committees accepted DeVany's recommendation to renew and extend the Northwest credit line, but conditioned its acceptance on Northwest's completion of certain conditions. As it turned out, Northwest failed to satisfy the stated conditions, and on or about December 5, 1988, DeVany halted funding on the credit line. There is evidence indicating that DeVany halted funding under Hurst's

direction, but that none of the individual defendants informed anyone at City Federal of the situation as of that time.

Meanwhile, sometime in the fall of 1988, the parent corporation of HonFed Bank ("HonFed"), a federally insured savings bank based in Hawaii, expressed interest in purchasing City Collateral. The RTC states that"according to the deposition testimony of Hurst, by late October to early November, Hurst, Ridder and Merkle were confident that HonFed was going to purchase City Collateral and that HonFed planned to employ them after the sale." Br. at 9. Coincidentally (or not), on October 21, 1988, City Collateral signed closing agreements with Ridder, Hurst and Merkle, providing each with substantial sums of money, i.e., the "golden handcuff payments," if City Federal sold City Collateral and each of them provided assistance with the City Collateral sale. Under the agreements each was to "render such additional assistance as may be necessary to assist and expedite the sale, transfer or assignment of [City Collateral]." The amount of compensation Ridder, Hurst and Merkle received under the agreements depended upon a number of factors, including, inter alia, City Federal's gross profit from the sale and whether each obtained employment with the purchaser after the sale. Also, they could collect their payments only if the sale occurred before March 31, 1989, and they were not terminated for cause before the deal closed. The RTC also states that during the same time period, presumably by late October or early November 1988, Hurst, Ridder and Merkle were negotiating their future employment contracts with HonFed. Br. at 9.

Sometime in November 1988, DeVany began to create a "customer history" on the Northwest Loan that he kept in City Federal's files. The history summarized activities involving the credit line. On November 28, 1988, HonFed signed a letter of intent to purchase City Collateral and began its due diligence process. The letter of intent obligated HonFed to purchase all of City Collateral's loans except those that were "non-performing or otherwise substandard." Moreover, the letter of intent expressed that one of the conditions of the sale was that Hurst, Ridder and Merkle would agree to join HonFed.

During its due diligence, HonFed reviewed the exception reports from the Northwest credit line. Testimony from Kathy Durham of HonFed indicates that HonFed rated the

Northwest credit line as a "watch" based on its history of losses and stale loans. A few days prior to the closing, HonFed notified City Federal that it was excluding the Northwest credit line from the sale.

In December 1988, DeVany met with Movroydis to discuss the situation with the credit line. At the meeting, which appeared at first in the customer history as having occurred on December 29, 1988, Movroydis admitted that he wrongfully had diverted collateral securing the loans obtained from City Collateral. Apparently, Movroydis was involved in what the parties refer to as a "kiting scheme," whereby he diverted the funds Northwest owed to City Collateral to cover marketing losses that Northwest had sustained in April and October 1987. DeVany did not tell anyone at City Federal of this admission at that time, but DeVany testified that he told Hurst about it. Apparently, the RTC learned in discovery that the meeting actually took place on December 22, 1988, rather than December 29, 1988. DeVany testified at his deposition that he changed the date of the meeting at Hurst's insistence, but Hurst denied that he ever ordered DeVany to do so. As described below, the closing date of the City Collateral sale was December 29, 1988. DeVany also testified that he changed the date of the customer history after the HonFed sale, but insofar as we can tell, his testimony does not indicate when Hurst asked him to change the date.

In the weeks prior to the closing, Ridder sent Gerry Czarnecki ("Czarnecki"), the chairman of the board of HonFed, a memorandum dated December 9, 1988, entitled "HonFed/CityFed Negotiations." The district court described the memorandum as containing "various recommendations that appear to run counter to City Federal's interest." Op. at 12-13. One of the items Ridder discussed in the memorandum was the Northwest credit line; in particular, he recommended that HonFed accept the Northwest credit line under certain conditions, and suggested the following course of action: "Your bargaining position [with City Federal] should be that if the credit does not improve to an `acceptable' or `pass' level (currently rated substandard by HonFed) rated by HonFed credit exam by March 31, 1989, that then all outstandings outstanding at that date are to

be repurchased by [City Federal.]" SA at 59. Importantly, the memorandum confirmed that the Northwest credit line was in technical default, and that Northwest "had excessive stale loans in warehouse due to operating problems and commitment glitches." Id. Ridder did not distribute the memorandum to anyone at City Federal, nor was it found in City Federal's files.

Notably, City Federal executive James McTernan testified at his deposition that no one told him prior to the HonFed closing about "operating problems" or "commitment glitches" with the Northwest account. See SA 64-65. Similarly, McTernan stated in a declaration that he was certain that he was not aware of any problems with the collateral securing the Northwest loan, and, in his deposition, he testified that he did not know that there was any technical default of the master agreement precluding the renewal of the credit lines. McTernan also indicated in his deposition that certain of the statements Ridder made in the memorandum were contrary to City Federal's interests, and therefore could have been grounds for termination. See app. at 552; SA at 65-68. McTernan also testified that he would have expected Ridder to circulate the memorandum to his superiors at City Federal, given that it contained recommendations that ran counter to City Federal's interests. See SA at 68.

The district court noted that HonFed decided to exclude the Northwest loan from its purchase of City Collateral's assets only a "few days" before the closing. Thus, it is reasonable to infer that the decision to exclude the loan occurred after Movroydis's admission to DeVany, and after Hurst became aware of it. See Op. at 13. The record supports the conclusion that HonFed made its ultimate decision after its receipt of the December 9, 1988, memorandum. In late December, and prior to the HonFed sale, McTernan asked Ridder how HonFed decided to leave the Northwest credit line with City Federal. McTernan testified that Ridder replied that HonFed had performed due diligence and elected not to purchase the credit line. He also indicated that Ridder did not mention the problems with the Northwest account at that time.

10

At or about the same time as the closing on December 29, 1988, Ridder, Hurst, and Merkle entered into employment contracts with HonFed providing for various benefits including incentive compensation and automobile expenses. Also, HonFed provided each individual with a signing bonus: Ridder received $42,000, Hurst received $26,250, and Merkle received $22,500. They also received monthly salaries of $11,667, $8,750, and $7,500, respectively. Ridder, Hurst and Merkle earned the maximum payments under their "golden handcuff " agreements: Ridder received approximately $279,000, Hurst received approximately $206,000, and Merkle received $150,000. See Op. at 14. Moreover, it appears that DeVany received $1,000 from a bonus pool Ridder, Hurst and Merkle established voluntarily. F&D's Br. at 9.

After the closing, City Federal created First Collateral Financial Services ("First Collateral") to assume City Collateral's former duties. In January 1989, Northwest defaulted on its obligations on the credit line; it failed to make payments due on January 1, 1989, and February 1, 1989. On February 15, 1989, DeVany, who continued to administer the Northwest credit line after the sale, provided City Federal with a status report that revealed problems with the credit line. The district court indicated in its opinion that DeVany's memorandum marked the first time that anyone at City Federal had been advised of the problems with the line. See Op. at 14. We note, however, that evidence in the record indicates that City Federal employees, including McTernan, knew generally in late January 1989, that there were problems with the credit line. In any event, the important point is that City Federal officials were kept in the dark with respect to the nature and severity of the situation until after the completion of the HonFed sale. On February 24, 1989, Movroydis met with City Federal executives and admitted that he misappropriated City Collateral funds. This was thefirst time that anyone at City Federal learned of the Movroydis admission and the details of his kiting scheme, despite the fact that DeVany and Hurst knew about the situation in December 1988, prior to the HonFed closing.

City Federal's senior in-house counsel, Amy Stein, Esq. ("Stein"), learned of the Northwest situation on March 6,

11

1989. At that point, Stein and A. Eugene Hull, Esq. ("Hull"), another in-house attorney at City Federal, commenced an investigation into the Northwest matter because they were concerned that employee misconduct may have caused the Northwest loss, thus triggering coverage under the F&D fidelity bond.

On March 20, 1989, after interviewing DeVany and Merkle, Hull drafted a letter entitled "Notice of Possible Loss," and sent it to F&D. The letter essentially tracked the language of the discovery definition in the bond, but provided no specific details concerning the factual basis for City Federal's belief that a covered loss had occurred.

The following day, March 21, 1989, Hull sent a supplemental letter to F&D. He estimated that City Federal incurred a $7 million loss on the Northwest account, but he again provided no specific information concerning the basis for his belief that employee misconduct caused the loss.

On March 30, 1989, F&D sought additional facts from

Hull concerning the suspect transaction, the losses sustained to date, the basis for City Federal's suspicion that employee dishonesty was involved, and any other information City Federal was willing to share. Unsatisfied with Hull's response to that letter, F&D wrote to Hull again on April 25, 1989. Specifically, F&D sought additional information concerning the factual basis for City Federal's suspicion that one or more of its employees was involved in fraudulent or dishonest conduct causing the Northwest loss. Hull did not respond to the correspondence, and F&D sent another letter seeking the same information on August 9, 1989. Again City Federal's legal department did not reply to F&D's correspondence.

Subsequently on December 7, 1989, the Director of the Office of Thrift Supervision, Department of the Treasury, declared City Federal insolvent and ordered it closed. The order also appointed the RTC as receiver for City Federal. Consequently, the RTC took possession of City Federal on December 8, 1989, and succeeded to all its rights, titles, assets, powers and interests, including City Federal's right, if any, to indemnification under the F&D bond. About two weeks later, the RTC filed its "Proof of Loss" with F&D. F&D denied the claim for coverage, and this litigation followed.

12

B. Procedural History

The RTC, as City Federal's successor, filed its complaint in the district court against F&D, Ridder, Hurst, DeVany and Merkle on March 6, 1992, asserting various state law claims. Count 1 of the complaint alleged that F&D breached its contract with City Federal because it failed to indemnify City Federal under the bond for the Northwest loss. Count 2 sought a declaratory judgment of coverage under the bond, and Count 3 alleged that F&D violated the implied covenant of good faith and fair dealing by denying coverage under the bond.[4]

F&D filed a motion for summary judgment, arguing that it was entitled to judgment as a matter of law on two separate grounds. First, it asserted that "Insuring Agreement A," which we call the fidelity provision, did not cover the losses caused by the alleged dishonest and fraudulent conduct by the individual defendants.[5] It claimed that no reasonable jury could find that the individual defendants acted with the requisite "manifest intent" both to cause a loss to City Federal and to obtain the type of financial benefit for a third party or themselves that would permit coverage under the bond. Second, F&D

_____

4. Counts 4 through 20 alleged various state law claims against Hurst, Merkle, Ridder and DeVany. On October 27, 1995, Merkle filed a motion for partial summary judgment. The district court denied the motion by opinion and order entered January 13, 1997. Merklefiled a motion for reconsideration, which the district court granted by letter order entered March 6, 1997. However, after considering the issues presented in the motion for partial summary judgment for the second time, the court denied the motion in its letter order. Merkle filed a motion for reconsideration of that last order, which the district court denied by letter order entered April 15, 1997. These rulings are not at issue in this

appeal.

5. The bond consisted of separate "Insuring Agreements," each of which protected against certain internal and external risks. All of the Insuring Agreements are subject to a common set of general agreements, definitions, conditions, limitations, and exclusions. The agreements, or coverages, include: (A) Fidelity, (B) Audit Expense, (C) On Premises, (D) In Transit, (E) Forgery or Alteration, (F) Securities, and (G) Counterfeit Currency. In this appeal, the RTC claims coverage only under "Insuring Agreement A."

13

maintained that under the general discovery definition found in section 4 of the "General Agreements" portion of the bond, no reasonable jury could conclude that City Federal "discovered" the loss during the bond period, as required for there to be coverage, even viewing the known facts as of March 22, 1989, the date the bond expired, in the light most favorable to the RTC. See Op. at 18.

The district court granted F&D's motion in its opinion and order entered January 29, 1998, and dismissed the RTC's claims against F&D with prejudice. First, the court concluded that there were genuine issues of material fact as to whether the individual defendants acted with the manifest intent to cause City Federal a loss which, at the same time, allowed them to obtain the type of financial gain that would establish coverage under the bond. The court held in the alternative, however, that summary judgment was appropriate on the basis that City Federal failed to discover the loss within the applicable bond period. See Op. at 31-32. The district court subsequently filed an order dismissing the action against F&D in its entirety, and after the remaining parties settled the case, the RTCfiled a timely notice of appeal of the summary judgment order.

III. JURISDICTION, STANDARD OF REVIEW and
      APPLICABLE LAW

The district court exercised subject matter jurisdiction

over this matter pursuant to 12 U.S.C. S 1441a(l)(1), which grants original jurisdiction to district courts over any action to which the RTC is a party. The FDIC was subject to jurisdiction in the district court by virtue of 12 U.S.C. S 1819(b)(2)(A).

We exercise appellate jurisdiction over this appeal pursuant to 28 U.S.C. S 1291, as the district court entered a final order dated September 3, 1998, dismissing the action. Because the RTC appeals from the district court's order of summary judgment entered January 29, 1998, our review is plenary. See Nelson v. Upsala College, 51 F.3d 383, 385 (3d Cir. 1995).

Preliminarily, we note that suits brought by the FDIC are deemed by statute to arise under the laws of the United

14

States. See 12 U.S.C. S 1819(b)(2)(A). Nevertheless, we treat this appeal as governed by the substantive law of New Jersey, inasmuch as both parties assume that New Jersey law applies, neither party contends that another state's law governs, and we see no basis for fashioning a federal rule of decision to resolve the issues we address today. See O'Melveny & Myers v. FDIC, 512 U.S. 79, 87-88, 114 S.Ct. 2048, 2055 (1994); FDIC v. Insurance Co. of N. Am., 105 F.3d 778, 779 n.1 (1st Cir. 1997); FDIC v. Oldenburg, 34 F.3d 1529, 1538 & n.10 (10th Cir. 1994); FDIC v. New Hampshire Ins. Co., 953 F.2d 478, 481-82 (9th Cir. 1991). In this regard, however, we note that many of the germane cases are from the federal courts as, not surprisingly, diversity jurisdiction frequently is present in litigation involving fidelity bonds. The cases often state common law principles which are not unique to any particular state.

IV. DISCUSSION

A. "Discovery" of the Loss

The RTC contends primarily that the district court erred in concluding that City Federal failed to discover the basis for its claim under the bond prior to the bond's expiration on March 22, 1989, as required for there to be coverage. It maintains that the issue of when the loss was "discovered" under the bond is inherently factual and thus properly is reserved for the trier of fact. It claims that the facts City Federal knew as of the expiration of the bond period, when considered in combination, were sufficient under the bond's discovery standard so that the issue should have been presented to a jury.

F&D contends in response that the district court's

disposition of the discovery issue was correct, as the court recognized that the information that City Federal learned prior to the expiration of the bond period was insufficient to warrant a jury finding that it "discovered" the loss as of that time. It argues that, at most, the facts and circumstances City Federal knew gave rise to suspicions about the individual defendants' misconduct, but that "mere suspicion of employee dishonesty or wrongdoing

15

during the bond period does not constitute discovery." Br. at 24. Citing cases in which the courts ruled in favor of the insurer on the issue of discovery, F&D claims they support its position because the insureds in those cases possessed "far more knowledge of facts about the alleged dishonesty than City Federal possessed" during the bond period. See id. at 25-28.

The bond at issue is known in the industry as a "Standard Form No. 22 bond." It is a "discovery bond," which by its terms requires that the insured discover the loss during the bond period as a condition to coverage. Thus, coverage expressly is limited by the following section, which defines "discovery" as the term is used throughout the various provisions in the bond:

> Section 4. This bond applies to loss discovered by the Insured during the bond period. Discovery occurs when the Insured becomes aware of facts which would cause a reasonable person to assume that a loss covered by the bond has been or will be incurred, even though the exact amount or details of loss may not then be known.

App. at 100. Moreover, section 5 of the General Agreements section of the bond states that "[a]t the earliest practicable moment, not to exceed 30 days after discovery of the loss, the Insured shall give the underwriters notice thereof." Id.

During the summary judgment proceedings before the district court, the RTC argued that a reasonable jury could find that City Federal discovered the loss during the bond period, given the information City Federal knew prior to the expiration of the bond period, and the discovery standard that applied. It relied on several pieces of information of which members of City Federal's legal department were aware as of March 20, 1989, the date City Federal sent its Notice of Possible Loss letter to F&D. Thus, its position essentially was that the facts City Federal knew showed that it possessed more than "mere suspicions of dishonesty." Specifically, it cited Stein's deposition testimony which detailed the various pieces of information City Federal's legal department discovered during the bond

period. Because the nature and extent of City Federal's knowledge is central to resolving the discovery issue, we

will set forth in some detail the factual basis for the RTC's argument.

First, Stein testified that she knew that the Northwest loss essentially "dropped out of the sky" without City Federal management receiving prior warning from any of the individuals responsible for monitoring the loan. She testified that it was "unprecedented" that a multi-million dollar loss would just appear out of nowhere, without prior warning signs being noticed by the employees working on the account. Yet, to the best of her knowledge at that time, none of the responsible employees revealed any warning signs to City Federal personnel.

Second, Stein knew that HonFed specifically excluded the Northwest credit line from its purchase of City Collateral's assets. Stein testified that it was incredible and very peculiar that HonFed would single out the Northwest loan and exclude it from the sale, particularly while City Federal employees responsible for the loan seemingly were unaware of its troubled status. Her testimony in this regard was:

> MS. STEIN: I mean, I can't imagine how HonFed could come up to a conclusion like that [i.e., that the loan should be excluded], having no ownership of the loan, where we had bank employees or City Collateral employees who were responsible for this loan. It just didn't square up. I mean, why does a buyer kick out a loan from a purchase? It's just not, you know, karma.

>     . . . .

> I just knew the HonFed deal was going down right around this time, and it seemed very peculiar to me that another financial institution kicks this loan out of its purchase.

> MR. KASLOW: Do you know if HonFed conducted any due diligence?

> MS. STEIN: Well, my point is this. If HonFed conducted due diligence and saw something that made it believe that this loan was not, you know, acceptable, where were our employees who were managing this loan and dealing with this borrower, why didn't they also

discover that and why wasn't that brought to management's attention?

Third, Stein knew that DeVany learned of Movroydis's fraudulent scheme in late December 1988, but failed to report his admission to management at City Federal or City Federal's legal department. She knew that DeVany met with Movroydis at or around the same time as the HonFed closing, and learned at that time that Movroydis converted monies Northwest owed to City Collateral and used the funds to cover marketing losses Northwest sustained in 1987. Stein testified that it was "bizarre" and contrary to bank policy that DeVany concealed that information rather than promptly notifying the legal department that one of its borrowers perpetrated a fraud. She explained:

> A borrower walks in, sits down with an account officer [DeVany], confesses to a multimillion dollar fraud, and the account officer doesn't call the legal department for months, the legal department doesn't even find out about it through the account officer? That is, you know, clearly weird. That's just not the way things worked in the real world, it's just not the way it works.

App. at 352. Stein explained later in her deposition that City Federal policy required its employees to notify the legal department of matters that had "a legal consequence or a legal issue" involved. In view of her belief that"certainly fraud or theft by a borrower would fall into that category," Stein thought DeVany's concealment particularly telling. App. at 349, 362.

Finally, Stein cited DeVany's demeanor as an additional factor that led her to believe that he had engaged in fraudulent or dishonest behavior causing the Northwest loss. According to Stein, DeVany did not seem credible during his interview with Hull, which occurred shortly before the bond period expired and prior to City Federal's Notice of Possible Loss letter dated March 20, 1989. The RTC also cited Hull's assessment of both DeVany's and Merkle's demeanor when he interviewed them. Hull testified that he did not find either of them forthcoming with information about the Northwest loss, which seemed contrary to what one would expect given the circumstances.

18

After reviewing each piece of information, the district court concluded that no reasonable jury could find that discovery had occurred as of the bond's expiration date. It explained that while the circumstances apparently gave rise to concern or suspicions that employees concealed

information from City Federal, there was "no evidence in the record to indicate that as of [March] 22, 1989, City Federal was aware of any specific dishonest conduct by the employees which proximately caused the Northwest loss." See Op. at 32. Specifically, the court noted that Stein's knowledge of the manner in which Northwest learned of the loss and her awareness of the fact that HonFed decided to exclude the account from the purchase did not provide a basis for assuming that the employees responsible for the administration of the credit lines caused the loss. Moreover, the court discounted the significance of the fact that Stein knew that DeVany was aware of Movroydis's scheme prior to the HonFed closing but failed to alert City Federal management or its legal department, stating:

> DeVany's failure to notify the legal department of the confession is not a definite basis for a careful and prudent person to charge him with fraud or dishonesty. At that time, his omission may have just as easily been classified as neglect. Further, this particular concealment was not the dishonest conduct that directly resulted in the Northwest loss: the culprits were the earlier ongoing misrepresentations of the condition of the credit line that proximately caused the claimed loss from the unpaid loans.

Op. at 33. The court also cited City Federal's failure to respond promptly to F&D's requests for additional information, and its admission in litigation with its subsequent insurer that as of the expiration of the F&D bond, City Federal had not determined "the specifics of any employee dishonesty in connection with those problem loans to Northwest." Op. at 33-34.

In reviewing the district court's grant of summary judgment, we must determine whether there is a genuine issue of material fact for trial on the issue of whether City Federal discovered the loss during the bond period. See FDIC v. Insurance Co. of N. Am., 928 F. Supp. 54, 58 (D.

19

Mass. 1996), aff'd on other grounds, 105 F.3d 778 (1st Cir. 1997). In this connection, we must view the facts in the light most favorable to City Federal and determine if a reasonable jury could conclude that a reasonable person would have assumed, based on the information City Federal knew as of March 22, 1989, that a covered loss had or would be incurred. Stated differently, summary judgment against the RTC on this issue of discovery was warranted only if there was no material dispute that the information City Federal knew provided an insufficient basis for a reasonable person to assume that a loss covered by the

bond had or would be incurred. See In re ContiCommodity Servs., Inc., Sec. Litig., 733 F. Supp. 1555, 1578 (N.D. Ill. 1990).6

For the reasons we explain below, we disagree with the district court's conclusion that no reasonable jury could find that City Federal "discovered" the Northwest loss during the bond period. Given the standard of discovery set forth in section 4 of the bond, we find that a reasonable jury could conclude, based on the information that City Federal knew as of the expiration of the bond period, that it was aware of sufficient facts that would cause a reasonable person to assume that a loss covered by the bond had or would be incurred. Accordingly, we will reverse the district court's summary judgment on this issue.

To explain our result, we first must set forth our understanding of the concept of discovery under the standard set forth in the bond. While we recognize that we addressed the general idea of "discovery" of a loss under a fidelity bond in Fidelity & Deposit Co. v. Hudson United Bank, 653 F.2d 766 (3d Cir. 1981), this case presents an issue of first impression in this circuit inasmuch as it requires us to interpret the meaning of the discovery standard found in the Standard Form No. 22 bond. 7 To

_____

6. In re ContiCommodity Services, Inc., Securities Litigation was a multi-district litigation case. See 733 F. Supp. 1555 (N.D. Ill. 1990). Other aspects of the district court's opinion, which are not relevant here, were affirmed sub nom in ContiCommodity Services, Inc. v. Ragan, 63 F.3d 438 (5th Cir. 1995), and reversed sub nom in Brown v. United States, 976 F.2d 1104 (7th Cir. 1992).

7. It appears that the RTC is willing to assume that the discovery standard we relied upon in Hudson United provides the rule of law that

20

reiterate, discovery occurs under section 4 of the bond "when the Insured becomes aware of facts which would cause a reasonable person to assume that a loss covered by the bond has or will be incurred, even though the exact amount or details of the loss may have not then been known." App. at 565. The date of "discovery" of the loss is

_____

we should apply here in determining if discovery occurred within the bond period. Nevertheless, we do not believe that it is self-evident that its
assumption is correct. In Hudson United, we followed cases holding that discovery under a fidelity bond occurs "when a bank has sufficient knowledge of specific dishonest acts to justify a careful and prudent

person in charging another with dishonesty or fraud." Hudson United, 653 F.2d at 774. We also noted that in defining when a bank "discovers" a loss for purposes of filing a notice of loss with its carrier, courts have held that "[a] bank is not under a duty to notify its insurance carrier until it has knowledge of some specific fraudulent act." Id. (citing, inter

alia, American Sur. Co. v. Pauly, 170 U.S. 133, 18 S.Ct. 552 (1898)). We simply cannot assume that the general discovery principles we cited in Hudson United automatically apply here, as our opinion there addressed a different issue--namely, whether the insurer was entitled to rescind its insurance contract based on the insured's failure to disclose a potential loss prior to the commencement of the bond period. See id. And more importantly, while we recognize that in Hudson United we found those general discovery principles helpful in addressing the question of rescission, section 4 of this bond explicitly provides the applicable discovery definition at issue in this appeal. See also National Newark & Essex Bank v. American Ins. Co., 385 A.2d 1216, 1224-25 (N.J. 1978) (addressing concept of discovery under fidelity bond in absence of controlling definition). Therefore, inasmuch as the parties contracted for a specific discovery provision, our analysis must begin with the plain language of the bond. But cf. First Sec. Savs. v. Kansas Bankers Sur. Co., 849 F.2d 345, 349 (8th Cir. 1988) (construing same discovery definition as in the present case and looking to "well-established rule" that insured under a fidelity bond is not bound to give notice until he has acquired knowledge of some specific or wrongful act) (citing, inter alia, Hudson United); see also First Dakota Nat'l Bank v. St. Paul Fire & Marine Ins. Co. 2 F.3d 801, 807 (8th Cir. 1993) (citing Kansas Bankers). Of course, we recognize that we may look to prior case law in attempting to ascertain the intended meaning of the parties' chosen language. See generally 13 John A. Appleman & Jean Appleman, Insurance Law and Practice S 7404 (2d ed. 1976). We simply point out here that we do not share the parties' apparent view that the discovery rules we cited in Hudson United are dispositive.

21

of practical significance because it not only determines whether the loss is covered by the bond, but also triggers the insured's obligation to give notice of the possible loss to its carrier "at the earliest practical moment, not to exceed 30 days." Id.

We understand this discovery standard as comprised of a subjective and objective component: the trier of fact must identify what facts and information the insured actually knew during the relevant time period, and it must determine, based on those facts, the conclusions that a reasonable person could draw from them. Our understanding in this connection comports with prior case law addressing the concept of "discovery" in the fidelity bond context. See United States Fidelity & Guar. Co. v.

Empire State Bank, 448 F.2d 360, 365 (8th Cir. 1971) ("In determining when discovery has taken place, the trier of fact must find the pertinent underlying facts known to the insured and must further determine the subjective conclusions reasonably drawn therefrom by the insured.") (applying Missouri law in absence of governing definition in bond); see also Wachovia Bank & Trust Co. v. Manufacturers Cas. Ins. Co., 171 F. Supp. 369, 375 (M.D.N.C. 1959) (adopting rule of law that mirrors discovery standard of Standard Form No. 22 bond, and stating that "The facts must be viewed as they would have been by a reasonable person at the time discovery is asserted, and not as they later appeared in the light of subsequently acquired knowledge.").

We also agree with F&D's position that the discovery definition requires that the insured possess more than mere suspicions of employee dishonesty or fraud. See Hudson United, 653 F.2d at 774 (citations omitted). Courts long have recognized the principle that unsupported suspicions of employee misconduct do not constitute discovery in the fidelity bond context, see, e.g., National Newark & Essex Bank v. American Ins. Co., 385 A.2d 1216, 1224 (N.J. 1978), and we believe that the language of the bond incorporates that requirement by tying the concept of discovery to "facts" within the insured's knowledge. Indeed, the language "facts which would cause a reasonable person to assume" defines the nature of information that the

22

insured must possess in order for it to be charged with discovery, and we agree with those courts of appeals which have stated that "discovery" of a loss under section 4 does not occur until the insured "discovers facts showing that dishonest acts occurred and appreciates the significance of those facts." See, e.g., FDIC v. Fidelity & Deposit Co., 45 F.3d 969, 974 (5th Cir. 1995) (quoting FDIC v. Aetna Cas. & Sur. Co., 903 F.2d 1073, 1079 (6th Cir. 1990)); see also California Union Ins. Co. v. American Diversified Savs. Bank, 948 F.2d 556, 564 (9th Cir. 1991) (same); Aetna Cas., 903 F.2d at 1079 (citing Empire State Bank, 448 F.2d at 364–66); cf. Royal Trust Bank, N.A. v. National Union Fire Ins. Co., 788 F.2d 719, 721 n.2 (11th Cir. 1986) (stating that same discovery definition does not require that the bank have enough information to charge its employee with fraud or dishonesty; "All that is required is that it have enough information to assume that the employee has acted fraudulently or dishonestly."). Moreover, we understand the objective, "reasonable person" component as permitting the trier of fact to analyze the full range of information the insured knew so as to determine whether a reasonable person would assume, based on all of the circumstances,

that a covered loss had or would be incurred. See Wachovia Bank, 171 F. Supp. at 376-77.

Inevitably, a court must assess each case on its own facts, keeping in mind the general principle that the "discovery threshold is low." See California Union, 948 F.2d at 563; see also Oldenburg, 34 F.3d at 1542 (quoting California Union and stating that the " `discovery threshold is low' "). Indeed, by adhering to that general principle, we remain true to the plain language of the bond. All that it requires is that the insured possess sufficient information to lead to a reasonable assumption of a covered loss; it states specifically that the insured need not know "the exact amount or details" of the loss to be charged with discovery under section 4.8

_____

8. Parenthetically, we observe that our understanding as to the level of knowledge that the bond requires for discovery to occur is informed by the reality that, to some extent, the bond places an insured in a difficult

predicament. Specifically, we point out that under section 5 of the bond,

23

With these basic precepts in mind, we may consider the specific facts of this case. As we have indicated, our review of the record leads us to conclude that a reasonable jury could find that City Federal possessed sufficient knowledge of facts that would cause a reasonable person to assume that a covered loss had or would be incurred as of March 22, 1989. Put simply, we believe that there is more than one reasonable conclusion that could be reached based on the facts City Federal learned during the crucial days just prior to the bond's expiration. First, City Federal knew for a fact that DeVany was aware of the Movroydis scheme, and committed a dishonest act by concealing the admission from City Federal and perhaps more significantly, its legal department.9 This is an important piece of information, and

_____

if the insured waits for too long a period after it is deemed to have "discovered" the loss, its insurer may deny coverage. Section 5 requires the insured to give notice of the loss within 30 days after "discovery of the loss." Indeed, we found cases addressing the concept of "discovery" of a loss under a fidelity bond in the context of insurers' claims that, as

a matter of law, discovery had occurred prior to the time the insured claimed it had. See, e.g., Interstate Prod. Credit Ass'n v. Fireman's Fund Ins. Co., 788 F. Supp. 1530, 1533-37 (D. Or. 1992). In these cases, the

insurers asserted that the insured waited too long after "discovery" of the

loss, thus precluding coverage because of the duty to give timely notice. Here, in essence, F&D's argument is the opposite: it claims that City Federal gave its notice too early rather than too late.

9. The district court discounted the significance of this fact, stating that "DeVany's failure to notify the legal department of the confession is not a definite basis for a careful and prudent person to charge him with fraud or dishonesty. At that time, his omission may have just as easily been classified as neglect." Op. at 33 (emphasis added). Regardless of the district court's views on this point, the RTC was not required to demonstrate that the concealment was a definite basis for a reasonable person to charge him with fraudulent or dishonest conduct in connection with the Northwest loss. Instead, the question at this juncture is whether a reasonable jury could conclude on the basis of that proof that City Federal possessed sufficient information to constitute discovery. Moreover, to the extent the district court recognized that the omission could be classified either as neglect or intentional concealment, that statement indicates that reasonable minds could differ, thus making summary judgment inappropriate. Finally, we also note that the court determined that City Federal's discovery of DeVany's concealment was not material because that concealment was not the dishonest conduct that "directly resulted" in the loss. Op. at 33. But we do not interpret the discovery definition in the bond as requiring as much.

24

it indicates to us that a jury could conclude that City Federal possessed more than mere unsupported suspicions of dishonest conduct. Compare California Union, 948 F.2d at 564-65 (affirming summary judgment for insurer on discovery issue where the evidence arguably showed that the insured knew of infractions of banking regulations, but there was no testimony to indicate that the non-wrongdoing employees knew of dishonest acts by other employees); Aetna Cas., 903 F.2d at 1079 (reversing summary judgment for FDIC and finding that discovery had not occurred during the bond period where the insured had suspected employee dishonesty was involved in a potential loss, but the suspicions grew from general conditions of bank and not from knowledge of any facts which indicated that its employee committed any dishonest acts). Moreover, City Federal was aware of the circumstance that, even after the HonFed sale, DeVany did not inform City Federal or its legal department of the Movroydis fraud; instead, City Federal learned of it because of Movroydis' admission to its management in February 1989.

Of course, a reasonable person would evaluate the

significance of these facts in the context in which they occurred: on or about the same date that Movroydis supposedly revealed his fraudulent scheme to DeVany, the HonFed deal closed. And in evaluating the importance of the timing of the Movroydis admission and DeVany's concealment, a reasonable person could find it telling that HonFed specifically excluded this account from the City Collateral assets it purchased. Indeed, this circumstance would appear exceptionally suspect in view of the fact that the Northwest loan loss "dropped out of the sky" in the sense that City Federal management possessed no knowledge of any significant problems with this account, or the existence of any loss, until after the closing date. Finally, Stein testified that she and Hull perceived DeVany's demeanor as "elusive" when they questioned him. While their assessment of his behavior would be insufficient, standing alone, to satisfy the discovery standard in the bond because mere suspicions are not enough to constitute "discovery," it certainly lends support to the conclusion that a jury could find in favor of the RTC on the discovery issue when it is considered in conjunction with the other factual

25

information in City Federal's possession during the relevant time period.

It appears to us that the district court overlooked the reasonable inferences that a jury could draw from the totality of information that City Federal knew during the relevant time period. Rather than considering the probative force of the information in its totality, the district court focused on each piece of information in isolation and resolved a disputed factual issue in F&D's favor. We recognize that finding the point at which discovery occurred is difficult, given the inherently fact-driven nature of the inquiry. It may be extremely difficult, then, to determine on summary judgment when the insured discovered a loss caused by employee dishonesty. Given the set of facts before us, we disagree with the district court's ultimate finding that the only reasonable conclusion to be drawn was that City Federal possessed nothing more than unconfirmed suspicions of employee misconduct relating to the Northwest account. Compare United States Fidelity & Guar. Co. v. Maxicare Health Plans, No. 96-2457, 1997 WL 466802, at *5 (E.D. La. Aug. 12, 1997) (finding as a matter of law at motion for summary judgment that insured discovered the loss within the meaning of the same bond definition where the insured possessed a similar level of knowledge as City Federal); see also Boomershine Pontiac-GMC Truck, Inc. v. Globe Indem. Co., 466 S.E.2d 915, 917 (Ga. Ct. App. 1996) (reversing order of summary judgment in favor of insurer in fidelity bond dispute on discovery

issue, stating that as long as there is room under the evidence for a reasonable difference of opinion as to whether insured discovered loss, summary judgment is inappropriate).

In reaching our conclusion we have considered but rejected F&D's arguments in support of the district court's resolution of the discovery issue. First, F&D asserts that City Federal's admissions in litigation against National Union Fire Insurance Company, its insurer that followed F&D, belie the RTC's contention that City Federal possessed sufficient factual information during the bond period for a jury to conclude that it had discovered the loss prior to its expiration. Specifically, it argues that "[City

Federal] acknowledged the limits of its information in the related National Union suit where it admitted that it knew of no specifics of any employee dishonesty in connection with the Loan prior to March 20, 1989, and further stated that much of the information in the proof of loss was learned after the Bond period had expired."10 Br. at 32-33. Apparently, the district court ascribed significance to the RTC's position in the National Union litigation, as it noted that the RTC stipulated in the Final Pretrial Order in that case that "prior to March 22, 1989, City Federal had not determined the specifics of any employee dishonesty in connection with those problem loans to [Northwest]." Op. at 34 (internal quotation marks omitted). It also noted that City Federal stipulated that it learned much of the information included in the proof of loss during the course of the investigation that took place during the late summer/early fall of 1989. See id.

F&D has not argued before us that the RTC's stipulations in the National Union litigation are binding in this case such that City Federal is precluded from asserting that it discovered the loss within the F&D bond period. See Hudson United, 653 F.2d at 777-78; see generally 9 Wigmore, Evidence S 2593 (Chadbourn rev. 1981) (discussing effect of judicial admissions and explaining that statement qualifying as a judicial admission generally is binding in subsequent parts of same proceedings between the same parties). Instead, we understand the thrust of its argument to be that the RTC's position in the National Union case undermines its assertion of discovery in this case.

_____

10. National Union Fire Insurance Co. ("National Union") issued a fidelity bond to City Federal which took effect on March 22, 1989, after the F&D bond expired. National Union filed a complaint in the United States

District Court for the District of New Jersey against the RTC, as receiver for City Savings Bank, F.S.B. (City Federal's successor), seeking a declaratory judgment that the bond was void because City Federal had failed to disclose in its bond application that it had sustained the Northwest loss. Notably, the RTC did not seek indemnification under the National Union bond for the Northwest loan loss. See Compl., National Union Fire Ins. Co. v. City Savings, F.S.B., No. 92-3408 (GEB). We understand that the National Union litigation is no longer pending before the district court.

27

In our view, the RTC has the better argument here, as it recognizes the logical flaw in F&D's argument. Specifically, the RTC's stipulation that City Federal learned "much of the information included in the proof of loss," after March 1989, does not mean that sufficient information was not available to City Federal prior to the expiration of the F&D bond so as to constitute discovery as of that date. Similarly, the circumstance that City Federal did not have specific information about the nature and scope of the employee dishonesty that caused the Northwest loss does not mean that what it did know as of March 22, 1989, was insufficient to warrant a reasonable assumption that a covered loss had or would be incurred, which is all that the discovery definition in the bond at issue here requires. Therefore, the RTC's statements in the National Union litigation are not incompatible with its position here and do not persuade us that F&D was entitled to judgment as a matter of law.

F&D also contends that the vague and conclusory nature of City Federal's letters to F&D confirm that as of the expiration of the bond period, City Federal possessed nothing more than unsupported suspicions of employee misconduct. It appears that the district court also ascribed significance to the fact that F&D repeatedly sought more specific factual information from City Federal, but City Federal failed to respond to those requests. Apparently, the argument here is that the tone of the letters and City Federal's omissions provide objective evidence that it possessed no specific information of employee wrongdoing.

Again, while these circumstances could be viewed as supportive of F&D's position, they do not demonstrate conclusively that F&D is entitled to judgment as a matter of law on the issue of the date of City Federal's discovery under the bond. In short, this argument does not overcome the fact that reasonable minds could differ on the discovery issue, given the nature of the RTC's proofs submitted at the summary judgment proceedings.

Next, F&D points out that throughout Stein's deposition

testimony, she repeatedly used the word "suspicious" to describe her assessment of the circumstances surrounding the Northwest loan loss and the individual defendants'

involvement in that loss. See Br. at 28-29. It claims that Stein's word choice is indicative of the quantity and quality of information City Federal possessed at the relevant time, and that her testimony actually supports its position that no reasonable jury could conclude that City Federal discovered the loss during the bond period.

We, however, do not share F&D's belief that Stein's deposition testimony demonstrates conclusively that she possessed only unsupported suspicions of employee misconduct insufficient to constitute discovery under the relevant standard. Indeed, review of the relevant deposition testimony demonstrates that F&D's argument focuses too narrowly on her use of the term "suspicious" without examining the context of her statements and the overall content of her testimony. We point out that while Stein stated that she was suspicious of Ridder, Hurst, Merkle and DeVany, she used the word "suspicious" in replying specifically to F&D's attorney's question, which asked her if she "suspected" that those employees engaged in misconduct. See SA at 293. In these circumstances, we do not find her responses particularly telling at all. In any event, they certainly do not demonstrate that, as a matter of law, City Federal did not discover the loss during the bond period. Cf. Interstate Prod. Credit Ass'n v. Fireman's Fund Ins. Co., 788 F. Supp. 1530, 1536-37 (D. Or. 1992) (rejecting insurer's argument that testimony of member of loan committee demonstrated that insured discovered loss where employee stated only that he had a "feeling" that the loans were questionable).

Moreover, other aspects of Stein's deposition testimony confirm that, in her view, the information she knew as of March 22, 1989, pointed to the conclusion that employee misconduct was involved in the Northwest loan loss, and thus that the loss was not the result of an employee's poor business judgment or negligence. For example, Stein stated specifically that with respect to DeVany's concealment of the Movroydis admission, she "ruled out the concept that it was negligence versus misconduct in regard to the concealment. . . . I mean, there's no-no way to my way of thinking that that was the result of negligence." App. at 374. Thus, we are not faced with a situation where the

evidence shows only that City Federal knew of the existence of the loss, but had not yet reached the subjective conclusion that employee dishonesty somehow was involved. Compare Block v. Granite State Ins. Co., 963 F.2d 1127, 1130 (8th Cir. 1992) (affirming district court's grant of summary judgment to insurer where "not one" bank official testified to a contemporaneous belief that bank employee misappropriated money during coverage period); cf. Maxicare Health Plans, No. 96-2457, 1997 WL 466802, at *5 (granting summary judgment to insurer where it argued that insured discovered loss prior to commencement of insurer's bond; court noted that insured's actions in terminating contract suggested that it subjectively believed it suffered a loss precipitated by employee dishonesty).

Finally, we note that F&D relies on cases in which the courts ruled in favor of the insurer on the issue of discovery, and contends that they are factually analogous to this case and thus support the district court's finding in its favor on that point. Br. at 26-27 (citing Block, 963 F.2d at 1129-30; California Union, 948 F.2d at 564-65; Aetna Cas., 903 F.2d at 1079). We need not tarry on this argument, however, as we do not agree with F&D's assessment that these cases are factually analogous. Put simply, the cases F&D cites in support of its position do not compel the conclusion it seeks because the outcome of each case, as in the present case, turned on its unique facts. Accordingly, a comparison of the quality and quantity of information within the insureds' knowledge in those cases ultimately does not persuade us that the district court's disposition of the issue at the summary judgment stage was appropriate.

As the foregoing discussion demonstrates, we disagree with the district court's assessment of the legal significance of the known facts as of March 22, 1989. We hold that the district court erred in concluding that no reasonable jury could find that City Federal "discovered" the loss during the bond period, and accordingly, we hold that summary judgment in F&D's favor was inappropriate.

B. Coverage under the Fidelity Provision

F&D argues in the alternative that if we find that the district court erred in its analysis pertaining to the

30

discovery issue, we should uphold the district court's order for summary judgment because the RTC cannot establish at trial that the Northwest loss falls within the narrow scope of coverage the bond provides. F&D's overarching argument is that the fidelity provision of the Standard Form

No. 22 bond provides coverage in very limited instances, and by its terms only insures against a specific type of risk. From that initial premise, it claims that the loss City Federal incurred on the Northwest loan does not fall within the narrow parameters of coverage.

The RTC contends that the district court's disposition of these issues is not before us because F&D did notfile a cross-appeal from the January 29, 1998 order for summary judgment. We disagree with the RTC's position that F&D was required to cross-appeal in order to advance these arguments for our consideration, as it is clear that we may affirm the judgment on grounds alternative to those on which the district court relied. See Rite Aid, Inc. v. Houstoun, 171 F.3d 842, 853 (3d Cir. 1999) (dismissing cross-appeals and stating "we point out that[appellees] are not by their cross-appeals seeking additional relief. . . . Rather, they advance the issue as an alternative ground to affirm the summary judgment and injunction."); E.F. Operating Corp. v. American Bldgs., 993 F.2d 1046, 1048 (3d Cir. 1993) ("It is also well established that an appellee may, without taking a cross-appeal, support the judgment as entered through any matter appearing in the record, though his argument may attack the lower court's reasoning or bring forth a matter overlooked or ignored by the court."); Cospito v. Heckler, 742 F.2d 72, 78 n.8 (3d Cir. 1984). Accordingly, we will consider F&D's arguments as alternative grounds to affirm the judgment.

The bond does not afford coverage under its fidelity provision for all losses resulting directly from fraudulent and dishonest employee conduct. The fidelity provision sets forth a subclass or type of dishonest or fraudulent conduct that may be covered under the bond. It promises to indemnify the insured for:

> (A) Loss resulting directly from dishonest or frau dulent acts of an employee committed alone or in collusion with others.

31

> Dishonest or fraudulent acts as used in this Insuring Agreement shall mean only dishonest or fraudulent acts committed by such Employee with the manifest intent:

> (a) to cause the Insured to sustain such loss, and

> (b) to obtain financial benefit for the Employee or for any other person or organization intended by the employee to receive such benefit, other than salaries, commissions, fees, bonuses, promotions,

> awards, profit sharing, pensions or other employee benefits earned in the normal course of employment.

App. at 562 (emphasis added). Broken down into its components, this provision requires that the following elements be present in order for a loss to constitute a covered event: (1) the insured must incur a loss; (2) the loss must have "result[ed] directly" from dishonest or fraudulent acts of an employee or employees; (3) the employee must have committed the acts with the "manifest intent" to cause the insured to suffer the loss sustained (which we call "subsection (a)'s requirement"); and (4) the employee must have committed the acts with the "manifest intent" to obtain a financial benefit for the employee or a third party, and the financial benefit obtained must not be of the type covered by the exclusionary clause (which we call "subsection (b)'s requirement"). See Jeffrey M. Winn, Fidelity Insurance and Financial Institutions in the Post–FIRREA Era, 109 Banking L.J. 149, 151–52 (Mar.–Apr. 1992). If F&D can establish, as a matter of law, that at least one of those requirements is not satisfied in this case, it would not be required to indemnify City Federal because the Northwest loss would not constitute a covered event. In that circumstance, we would affirm the district court's order for summary judgment on this alternative basis.

F&D concedes that the RTC established that City Federal suffered a loss on the Northwest account, but contends that the remaining elements necessary for coverage under the fidelity provision are absent in this case. Specifically, its arguments may be broken down into two broader categories. First, F&D asserts that there is insufficient

32

evidence from which a jury could conclude that the individual defendants acted with the "manifest intent" (1) to obtain for themselves or a third party a type offinancial benefit covered by the bond, and in turn (2) to cause City Federal to sustain the Northwest loss. Second, F&D maintains that there is insufficient evidence from which a reasonable jury could conclude that the Northwest loss "result[ed] directly" from the individual defendants' dishonest and fraudulent actions that form the basis for this lawsuit.

We will address these arguments in the following manner. In subsection (1) below, we first must ascertain the correct definition of the term "manifest intent" as it is used in the fidelity provision. We then must decide whether the RTC has presented sufficient evidence that the employees acted with the "manifest intent" to obtain a

financial benefit for themselves or a third party that does not fall within the category of benefits specifically excluded by subsection (b), as that inquiry informs the remainder of our analysis. We will conclude by examining whether there is sufficient evidence from which a reasonable jury could find that the employees acted with the manifest intent to cause City Federal to sustain a loss on the Northwest credit line. In subsection (2), we will address separately F&D's causation argument, and consider whether there is sufficient evidence from which a reasonable jury could conclude that the Northwest loss "result[ed] directly" from the individual defendants' dishonest and fraudulent acts. As we will explain in greater detail below, we have concluded, based on the bond's language and the proofs the RTC presented at the summary judgment proceedings, that there are genuine issues of material fact pertaining to each element described above. Therefore, while we reach our conclusion on different grounds than those on which the district court relied, we agree with its ultimate determination which we described above, that a jury could find that the Northwest loss falls within the narrow parameters of coverage.

1.     Whether the individual defendants committed dishonest and fraudulent acts with the manifest intent to cause City Federal to sustain the Northwest loss and to obtain a certain type of financial benefit for themselves or a third party

a. The meaning of "manifest intent"

In order to determine if the RTC has presented sufficient evidence from which a reasonable jury could conclude that the individual defendants acted with the "manifest intent" to cause the Northwest loan loss and to obtain a certain type of financial benefit for themselves or a third party, we must begin by defining the term "manifest intent" in the fidelity insurance context. Initially, we point out that it is rather obvious that the term "manifest intent" refers to the employee's state of mind in engaging in the allegedly dishonest or fraudulent acts which the insured claims to have caused it a loss covered by the fidelity bond. Inasmuch as the Supreme Court of New Jersey has not identified the meaning of the term under New Jersey law, our task is to predict how that court would decide this issue.[11] See McKenna v. Ortho Pharm. Corp., 622 F.2d 657, 661 (3d Cir. 1980). And, as is evident from our discussion that follows, the answer is not resolved easily, as it appears that there has been considerable debate among various state and federal courts concerning the proper formulation of the standard. See Christopher Kirwan, Mischief or "Manifest

Intent"? Looking for Employee Dishonesty in the Unchartered World of Fiduciary Misconduct, 30 Tort & Ins. L.J. 183, 186 (Fall 1994) ("In the eighteen years since its introduction the

_____

11. We note that the New Jersey Supreme Court in National Newark discussed the meaning of the phrase "dishonest or fraudulent acts" in the context of a fidelity bond. It held that the phrase encompassed "any acts which show a want of integrity or a breach of trust," and "conduct which indicates a reckless, willful and wanton disregard for the interest of the employer if it be an act manifestly unfair to the employer and palpably subjects him to likelihood of loss." National Newark, 385 A.2d at 1222 (internal quotation marks and citations omitted). However, as F&D correctly notes in its brief, the bond at issue in National Newark did not contain the manifest intent limitation which is the subject of the parties' dispute in this case.

term `manifest intent' has become the major battlefield in dishonesty coverage disputes.").

In virtually all of the cases we have found, courts have interpreted the term "manifest" as meaning that the intent of the employee must be "apparent or obvious." See, e.g., Oldenburg, 34 F.3d at 1539; FDIC v. St. Paul Fire & Marine Ins. Co., 942 F.2d 1032, 1035 (6th Cir. 1991); North Jersey Savs. & Loan Ass'n v. Fidelity & Deposit Co., 660 A.2d 1287, 1291 (N.J. Super. Ct. Law. Div. 1993); see also 11 Lee R. Russ and Thomas F. Segalla, Couch on Insurance 3d S 161:3 (1998). The divergence of opinion, however, stems from the issue of whether the "intent" aspect of the phrase "manifest intent" requires an inquiry into the employee's actual purpose in engaging in the conduct at issue. While the fidelity provision covers only those dishonest or fraudulent acts undertaken with the manifest intent both to (1) cause the insured (who is also the employer) to sustain a loss, and (2) obtain a certain type of financial benefit, the question of the meaning of "intent" usually arises in the context of determining whether the proofs show that the former requirement has been satisfied. Indeed, in virtually all of the cases interpreting the term "intent," the analysis has focused on whether the evidence showed that the employees possessed a "manifest intent" to cause the insured's loss. Of course, this is not surprising, given the fact that most cases turn on this element, as it presents difficult proof problems for the insured.

Following this method of analysis, succinctly stated, the initial question is whether the insured must establish that the employee acted with the specific purpose or desire to cause the insured to sustain the loss that it did. The related issue then is the type of circumstantial evidence

relevant to the insured's burden of proof on this point.

In determining the appropriate construction of the "manifest intent" state of mind requirement, a review of the purpose and history behind its inclusion in bonds of this type is instructive. The Surety Association introduced the "manifest intent" language in its standard form bond in 1976 to ameliorate the effect of previous cases in which the courts expanded the concept of employee dishonesty to the point where the term included any act of the employee (or

any failure to act), regardless of motive. See Michael Keeley, Employee Dishonesty Claims: Discerning the Employee's Manifest Intent, 30 Tort & Ins. L.J. 915, 919 (Summer 1995); see also Winn, supra at 152 ("According to an influential subcommittee report issued by the Surety Association of America in January 1976, insurers added the definition of dishonesty because [a] major factor in poor results . . . has been a well-established pattern by the courts to expand the concept of dishonesty to the point where the term now seems to include any act . . . regardless of motive, which results in an injury to the employer.") (internal quotation marks omitted) (quoting Surety Ass'n of Am. Sub-Committee, Revision of the Dishonesty Insuring Agreement of Form 24, at 1 (1976)). Thus, as one commentator explained: "Insuring Agreement A [which contains the manifest intent requirement] was revised to clarify the Surety Association's long-standing intent, dating back to Standard Form No. 1 in 1916, to limit loan losses to claims in which the culpable employee acted with the intent or purpose to gain a benefit at the expense of his employer--in other words, when the employee intended to defraud the insured bank of money." Keeley, supra at 919.

Against this background, we must examine the different standards courts have adopted in defining the bond's "manifest intent" requirement. To date, the Courts of Appeals for the Sixth, Seventh and Tenth Circuits have adopted the following standard of culpability: "Although the concept of manifest intent does not necessarily require that the employee actively wish for or desire a particular result, it does require more than a mere probability. . . . Manifest intent exists when a particular result is substantially certain to follow from conduct." See Peoples Bank & Trust Co. v. Aetna Cas. & Sur. Co., 113 F.3d 629, 635 (6th Cir. 1997) (applying Virginia law and quoting St. Paul Fire & Marine, 942 F.2d at 1035) (internal quotation marks omitted); Oldenburg, 34 F.3d at 1539 (citing FDIC v. United Pac. Ins. Co., 20 F.3d 1070, 1078 (10th Cir. 1994)) (applying Utah law); United Pac., 20 F.3d at 1078

(interpreting "manifest intent" under general principles of
federal common law); Heller Int'l Corp. v. Sharp, 974 F.2d
850, 857-59 (7th Cir. 1992) (applying Illinois law and

quoting St. Paul Fire & Marine, 942 F.2d at 1035); St. Paul
Fire & Marine, 942 F.2d at 1035. But cf. First Fed. Savs. &
Loan Ass'n v. Transamerica Ins. Co., 935 F.2d 1164, 1167
(10th Cir. 1991) (affirming order of summary judgment for
insurer, explaining that employee did not possess a
manifest intent to injure the bank, his employer, where
evidence pointed to only one conclusion: that employee
arranged transactions that "hopefully" would be beneficial
to both the bank and borrowers). This standard, which
requires only that the loss was "substantially certain to
follow" from the employee's conduct, was articulated by the
Court of Appeals for the Sixth Circuit in St. Paul Fire &
Marine, see 942 F.2d at 1035, which in turn relied on
language from Hanson PLC v. National Union Fire Insurance
Co., 794 P.2d 66, 72 (Wash. Ct. App. 1990).

In stating that the "manifest intent" standard is satisfied
either by proof of the employee's desire to cause a loss or by
proof that the loss was "substantially certain" to result,
these cases embraced a different, and less culpable mental
state, than if the standard required that the evidence show
that it was the employee's specific purpose or desire to
cause the insured to sustain the loss and obtain afinancial
benefit at the insured's expense. Indeed, one commentator
described this "substantially certain to follow" standard as
requiring, in essence, a level of mental culpability
equivalent to the general intent concept embodied in the
area of criminal and tort law. See Keeley, supra at 937; see
also Affiliated Bank/Morton Grove v. Hartford Accident &
Indem. Co., No. 91-C-4446, 1992 WL 91761, at *4-5 (N.D.
Ill. Apr. 23, 1992) (stating that the definition of intent that
it adopted, i.e., that an employee acts with the manifest
intent when the evidence demonstrates either (1) that the
purpose was to achieve the particular result or (2) that the
person knows that the particular result is substantially
certain to follow from his or her conduct, is consistent with
concept of intent in tort law); see also United Pac., 20 F.3d
at 1078 (stating that jury instructions 36 and 37 provided
"general intent" standard that was a correct explication of
the meaning of "manifest intent"); Hanson PLC, 794 P.2d at
72. Moreover, the concept of general intent is synonymous
with the Model Penal Code's mental state "knowingly," as a
person acts knowingly under the Model Penal Code if he or

she is aware that " `a result is practically certain to follow from his conduct, whatever his desire may be as to the result.' " See Keeley, supra at 923-24.

Thus for example, in United Pacific, the Court of Appeals for the Tenth Circuit upheld jury instructions stating, inter alia: "the concept of manifest intent does not require that the employee wish or desire for a particular result, but it does require that the result be substantially certain to happen' "; " `You may consider it reasonable to draw the inference and find that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted' "; and " `There was an intent to cause the bank to sustain a loss if the natural result of [the employee's] conduct would be to injure the Bank even though it may not have been his motive.' " Id. at 1077-78 (citing Heller, 974 F.2d at 859; St. Paul Fire & Marine, 942 F.2d at 1035; First Nat'l Bank v. Lustig, 961 F.2d 1162, 1166 (5th Cir. 1992)); see also Oldenburg, 34 F.3d at 1539 (citing United Pac., 20 F.3d at 1078).

In contrast to the construction of "manifest intent" adopted by the Courts of Appeals for the Sixth, Seventh and Tenth Circuits, the Courts of Appeals for the Second, Fourth and Fifth Circuits have applied the term "manifest intent" differently, and we read those cases as requiring that the insured establish that the employee acted with the specific purpose or desire to both injure the insured and obtain a benefit. See General Analytics Corp. v. CNA Ins. Cos., 86 F.3d 51, 54 (4th Cir. 1996); Lustig , 961 F.2d at 1166-67; Glusband v. Fittin Cunningham & Lauzon, Inc., 892 F.2d 208, 210-12 (2d Cir. 1989) (reversing judgment for insured's receiver and entering judgment for insurer, stating that there was insufficient evidence that the employee acted with the manifest intent to cause a loss and obtain a financial benefit; court explained that manifest intent language limits coverage to losses caused by embezzlement and embezzlement-like acts, and that the evidence showed only that the employee intended to benefit the company rather than cause it a loss); Leucadia, Inc. v. Reliance Ins. Co., 864 F.2d 964, 972-74 (2d Cir. 1988) (affirming judgment for insurer where the only reasonable conclusion that could be drawn from the evidence

38

introduced at trial was that the employee's dishonest actions were the result of attempts to save the employer from sustaining a large loss).12 In this regard, the "manifest

---

12. Interestingly, the Court of Appeals for the Second Circuit has not stated expressly that the term "manifest intent" covers only those acts

undertaken with the purpose or desire of causing the employer's loss and obtaining a financial benefit, but a review of the facts and circumstances in Glusband, see 892 F.2d at 208, and Leucadia, see 864 F.2d 964, indicate that the court applied the manifest intent standard by focusing on the employee's subjective purpose in engaging in the wrongful acts at issue. For example, in Leucadia, the employee engaged in various dishonest and fraudulent acts that eventually contributed to his employer's substantial losses on loans he originated. See 864 F.2d at 972-74. The nature of the employee's wrongful acts in Leucadia clearly were such that a jury could have concluded that by engaging in that course of conduct, he knew that a loss to his employer was substantially certain to result. See id. Nevertheless, the court affirmed the jury's judgment for the insurer, reasoning that the evidence did not demonstrate that the employee's dishonest acts were undertaken with the manifest intent to cause a loss or obtain afinancial benefit. And the court in Glusband explained the holding in Leucadia by referencing the employee's object in engaging in the course of conduct at issue, and stating that "[b]ecause the employee misguidedly hoped to benefit his employer and received no personal gain from the transaction, we held that the requisite manifest intent had not been shown." 892 F.2d at 211. By referencing the employee's "hopes" (albeit misguided) in engaging in the misconduct, the court clearly was concerned with the employee's subjective purpose rather than whether the loss was substantially likely to result from the employee's actions. See Jane Landes Foster, et al., Does a Criminal Conviction Equal Dishonesty? Criminal Intent Versus Manifest Intent, 24 Tort. & Ins. L.J. 785, 799-800 (Summer 1989) (interpreting Leucadia as applying a subjective purpose test despite the fact that the court did not use the word "purposeful" in its opinion).

Similarly, the Court of Appeals for the Fifth Circuit's opinion in Lustig did not state explicitly that the term "intent" requires proof of purpose or
desire to cause the a loss and obtain a financial benefit for the employee or a third party. Nevertheless, insofar as the court's reasoning clearly focuses on the employee's purpose or motive in engaging in the dishonest or fraudulent acts at issue and the ways in which the bank could prove that element, see 961 F.2d at 1165-67, its approach demonstrates its adherence to a standard of culpability greater than that suggested by the "substantially certain" or knowingly standard. Compare id. with United Pac., 20 F.3d at 1077-78; see also Keeley, supra at 932-33 (stating that Lustig appears to require an inquiry into the employer's purpose).

39

intent" requirement thus may be analogized loosely to the concept of "specific intent" in the criminal law context. See Keeley, supra at 942 (advocating the adoption of a specific intent standard for purposes of defining "manifest intent"); Judy L. Hlafesak, Comment, The Nature and Extent of Subrogation Rights of Fidelity Insurers Against Officers and Directors of Financial Institutions, 47 U. Pitt. L. Rev. 727, 731-32 (1986) (stating that "manifest intent" language of

1976 form rider required proof of the employee's specific intent to cause a loss).

An instructive example of this approach is found in the Court of Appeals for the Fourth Circuit's opinion in General Analytics. See 86 F.3d at 54. There the insured, General Analytics Corp. ("GA"), sought coverage under a fidelity bond for losses it incurred as a result of an employee's actions in altering incoming purchase orders sent by the insured's customer, the Internal Revenue Service ("IRS"), for computer products. Not realizing that the purchase orders had been altered, GA personnel filled the IRS's requests by ordering parts from a third-party supplier. When GA delivered the parts to the IRS, it refused acceptance, causing GA to sustain a large loss. The district court granted summary judgment to GA against its insurer, finding that the evidence showed beyond any factual dispute that the employee acted with the manifest intent to benefit a third party. See id. at 52–53.

The court of appeals reversed the district court's grant of summary judgment to GA, finding that reasonable minds could differ as to whether the loss was caused by employee misconduct undertaken with the manifest intent to obtain a financial benefit for a third party. Because the parties disputed the district court's construction of the term "manifest intent," the court of appeals analyzed its meaning in the fidelity bond context. The court recognized that "employee dishonesty policies" are "designed to provide coverage for a specific type of loss characterized by embezzlement, which involves the direct theft of money." Id. at 53. The court then explained that:

> Because employee dishonesty policies like CNA Insurance's require proof that the employee have acted to accomplish a particular purpose, they require that

> the insured establish a specific intent, analogous to that required by the criminal law. Thus, if a dishonest act has the unintended effect of causing a loss to the employer or providing a benefit to the employee, the act is not covered by the policy. . . .
>
> As a state of mind, intent is often difficult to prove. And because it is abstract and private, intent is revealed only by its connection with words and conduct. . . . Thus, evidence of both words and conduct is probative of intent, . . . and, because context illuminates the meaning of words and conduct, evidence of the circumstances surrounding such words or conduct, including the motive of the speaker or

        actor, similarly is admissible.

Id. at 54 (citations omitted).

The court in General Analytics required proof of the
employee's specific intent or purpose to cause the insured
loss and to obtain a certain type of financial benefit for
herself or a third party, but in adopting that state of mind
requirement as the standard for "manifest intent," it
recognized that the employee's subjective intent may be
proven circumstantially by reference to evidence of the
employee's words, conduct, and the context in which his or
her actions took place. See also Lustig, 961 F.2d at 1166
("When an employee obtains fraudulent loans with reckless
disregard for a substantial risk of loss to the bank, a jury
may infer from his reckless conduct and surrounding
circumstances that he intended to cause the loss. . . . The
jury should be instructed that in answering the question of
intended loss, it should consider the range of evidentiary
circumstances, including the relationship between the
borrowers and the employee, the employee's knowledge of
the likelihood that the loans would not be repaid, and all
other surrounding circumstances bearing on the employee's
purpose.") (citations and quotation marks omitted)
(emphasis added).

Thus in General Analytics the court permitted
consideration of both the reckless nature of the employee's
conduct, and the likelihood that a loss would result from
the employee's conduct (i.e., the employee's knowledge of

                                  41


the substantial likelihood of the result), in determining
whether the employee acted with the "manifest intent" to
cause the insured to sustain a loss. But the court tied the
significance of those circumstances to a standard of
employee culpability that required proof that the employee
acted with the specific purpose to achieve the desired
result, i.e., a specific intent to cause the loss and obtain a
financial benefit for herself or a third party. See also
Susquehanna Bancshares, Inc. v. National Union Fire Ins.
Co., 659 A.2d 991, 998 (Pa. Super. Ct. 1995) ("[W]e hold
that the `manifest intent' of the employee should be
ascertained by deciding his true purpose in causing the
loss. In deciding what the purpose was, both direct and
circumstantial evidence should be considered, including the
employee's own testimony as to his purpose as well as any
evidence indicating the employee knew the loss was
substantially certain to be the result of his acts.").

A review of the different approaches reveals the obvious
distinction between the two lines of cases. As is evident

from our discussion, under either approach, evidence tending to show that the employee acted "knowingly" would support a jury finding that the employee intended the consequences of his actions. Nevertheless, under the rationale explicitly adopted in General Analytics, proof of an employee's recklessness, or an employee's knowledge that a result was substantially certain to occur from the conduct, are objective indicia--manifestations--of the employee's specific purpose or intent. But neither an employee's recklessness or his knowledge that a result was substantially certain to occur would satisfy the language of the policy, absent that inference of specific intent. Cf. Peoples Bank, 113 F.3d at 636 ("Like our sister circuits, we recognize that reckless conduct might be evidence--a manifestation--of intent. But recklessness itself, without an inference of intent, would clearly not satisfy the language of the policy, any more than recklessness alone would create culpability for a crime requiring specific intent.") (citing General Analytics, 86 F.3d at 54). In contrast, those courts that have equated the term "intent" with the mental state "knowingly" would find that the employee acted with the manifest intent where the loss and the benefit were

42

substantially certain to follow, regardless of whether the employee desired such results.

Interestingly in this case, regardless of the standard we choose to adopt, we believe that the proofs are sufficient to demonstrate a genuine issue of material fact concerning the employees' "manifest intent." Nevertheless, in view of the circumstance that we must remand this case to the district court for trial, we believe that it is appropriate at this juncture to state specifically which standard we adopt as reflecting what we think the Supreme Court of New Jersey would hold so as to give guidance to the district court.

We agree with the approach espoused by the Courts of Appeals for the Second, Fourth and Fifth Circuits, and hold that the term "manifest intent" as it is used in the fidelity provision requires the insured to prove that the employee engaged in dishonest or fraudulent acts with the specific purpose, object or desire both to cause a loss and obtain a financial benefit. Inasmuch as we equate the"substantially certain to result" standard with the mental state "knowingly," we are of the view that "purposefully" rather than "knowingly" better captures the meaning of "intent" as it used in the fidelity provision, given the history that prompted its inclusion in the dishonesty definition and its stated purpose. Indeed, we believe that our construction strikes an appropriate balance because it comports with the drafters' obvious intent to limit the types of employee

misconduct covered by this provision but ensures that proof of the employee's recklessness and the substantial likelihood of loss factor into the ultimate inquiry into the employee's subjective state of mind. See Keeley, supra at 925 (noting that the Model Penal Code's definition of specific intent supports equating "manifest intent" with specific intent); Winn, supra at 152 ("We are ready and willing to insure against dishonesty, i.e., against improper acts of employees committed with an intent to deprive their employer of funds or property. We cannot insure against violations of instructions or poor business judgment."); see also Jane Landes Foster, et al., Does a Criminal Conviction Equal Dishonesty? Criminal Intent Versus Manifest Intent, 24 Tort. & Ins. L.J. 785, 800 (Summer 1989) ("Defining manifest intent in terms of purpose is also more in keeping

43

with the intent of the fidelity industry. This clause represented a specific response to a growing number of decisions that judicially expanded the definition of dishonesty by recognizing claims based on reckless misconduct. Thus, it is clear that the drafters intended to limit coverage by requiring proof of a more particularized intent to harm.").

We emphasize, however, that by recognizing that the term "manifest intent" requires proof of the employee's purpose in engaging in the dishonest or fraudulent acts, we are cognizant that the employee's actual subjective state of mind virtually is impossible to prove absent resort to circumstantial evidence--objective indicia of intent. The Courts of Appeals for the Fourth and Fifth Circuits have recognized this proof problem, and permitted the insured to prove the employee's subjective purpose by introducing objective evidence of the employee's intent. See Lustig, 961 F.2d at 1166; General Analytics, 86 F.3d at 54; see also Susquehanna Bancshares, 659 A.2d at 998. And inasmuch as proof of recklessness and/or the employee's knowledge of the likelihood that a loss was to result both serve as manifestations of the employee's specific purpose or design, we hold that a jury may consider those factors, along with any other objective indicia of intent, in ascertaining the employee's state of mind in engaging in the wrongful conduct. See Couch 3d, supra S 161:3 (stating that "manifest intent" language meant an intent that was "apparent or obvious," and indicating that in determining the employee's intent or purpose, the court should consider the employee's testimony as to what his or her purpose was in engaging in the acts, and whether the employee was substantially certain that a particular result would be achieved, together with external indicia of subjective intent).

In reaching our conclusion, we recognize that our task here is limited to deciding the meaning of the term "manifest intent" as we believe it would have been decided by the Supreme Court of New Jersey had the case arisen in the New Jersey courts. See Robertson v. Allied Signal, Inc., 914 F.2d 360, 378 (3d Cir. 1990). Thus, in addition to relying on cases from other jurisdictions, we have considered the well-established rules for contract

44

interpretation as they have developed under New Jersey law. We note, in particular, that New Jersey adheres to the principle of contra proferentum, which requires any ambiguities in an insurance contract to be resolved in favor of the insured. See Pittston Co. Ultramar Am. Ltd. v. Allianz Ins. Co., 124 F.3d 508, 520 (3d Cir. 1997). Nevertheless, "[w]hen the terms of an insurance contract are clear, . . . it is the function of a court to enforce it as written and not make a better contract for either of the parties." New Jersey v. Signo Trading Int'l, Inc., 612 A.2d 932, 938 (N.J. 1992) (citation and internal quotation marks omitted). Thus, we must not torture the language of a contract to create ambiguity where none exists in order to impose liability, and we must construe the words of an insurance policy so as to adhere to their ordinary meaning. See Longobardi v. Chubb Ins. Co., 582 A.2d 1257, 1260 (N.J. 1990). Under New Jersey law, ambiguity exists in an insurance contract where "the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage." Weedo v. Stone-E-Brick, Inc., 405 A.2d 788, 795 (N.J. 1979).

We have not overlooked the possibility that one could argue that given the divergence of opinion concerning the correct standard for determining the employee's "manifest intent," the term is ambiguous, thus requiring us to invoke the principle of contra proferentum. See, e.g., Oritani Savs. & Loan Ass'n v. Fidelity & Deposit Co., 821 F. Supp. 286, 290 (D.N.J. 1991) (rejecting that argument in the context of determining appropriate construction of "manifest intent"). If that were the case, we would be compelled then to find that the term "intent" requires only that the loss be "substantially certain to result," as it is a more lenient standard of employee culpability. Here, however, we do not believe that the Insuring Agreement is ambiguous because we cannot conclude that the "phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage." Weedo, 405 A.2d at 795. Rather, we find that the principle that courts" `should not write for the insured a better policy of insurance than the one purchased' " applies squarely to the facts of this case. Longobardi, 582 A.2d at 1260 (quoting Walker Rogge, Inc. v.

Chelsea Title & Guar. Co., 562 A.2d 208, 214 (N.J. 1989)).

Moreover, we further observe that in performing our task of "predicting" how the New Jersey Supreme Court would decide this issue, we have reviewed two cases from other courts which applied the manifest intent requirement under New Jersey law in a manner that supports our result. See McKenna, 622 F.2d at 662. First, in Oritani, the district court held that the term manifest intent requires the employee to possess the "subjective intent" to cause the employer loss. See 821 F. Supp. at 291. In reaching its conclusion, the court found persuasive the insurer's argument that the fidelity provision covers only those losses that were caused by "deliberate" conduct motivated by a "deliberate" intent. See id. at 288. The court granted the insurer's motion for summary judgment because it was undisputed that the employee was not a knowing participant in the scheme that caused the loss. See id. at 291.

We find the court's requirement of a "subjective intent" particularly noteworthy because the court could have reached the same result by adopting the "knowingly" standard given the facts of the case, but it chose instead to state the standard as requiring an inquiry into the employee's motive and subjective state of mind. Thus, the court determined that proof of the employee's recklessness or negligence would not suffice under the subjective standard it adopted, so long as the circumstances suggested only that the employee exercised poor business judgment and acted with "a pure heart." See id.

Similarly in North Jersey, the New Jersey Superior Court, Law Division, granted summary judgment to the insurer in a fidelity bond dispute because the evidence submitted pertaining to the question of manifest intent showed only that the employee exercised poor judgment. See 660 A.2d at 1292–93. The North Jersey court, citing, inter alia, the Court of Appeals for the Second Circuit's opinion in Leucadia, held that the evidence did not permit a reasonable inference that the employee's "motive" or "purpose" was to cause a loss to his employer. See id.

In light of the foregoing, we hold that the term"manifest intent" requires the insured to demonstrate that it was the offending employee's purpose or desire to obtain afinancial

benefit for himself or a third party, and to cause the

insured to sustain a loss. And given that a jury could infer such an intent based on circumstantial evidence, an insured may survive a motion for summary judgment by proffering evidence suggesting that the employee acted knowing that it was substantially certain that his or her conduct would cause the insured to sustain a loss that would inure to the employee's benefit, see Lustig, 961 F.2d at 1166-67, and by offering any other proof tending to establish the employee's intent. See also General Analytics, 86 F.3d at 54 (stating that an employee's words and conduct are probative of intent, and that the context in which the words and conduct occurred also is relevant).

47